[No. S035367. Mar. 3, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
CEDRIC HARRISON, Defendant and Appellant.

**COUNSEL**

Thomas Kallay, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Ronald S. Matthias and Jeffrey M. Laurence, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**KENNARD, J.**—An Alameda County jury convicted defendant Cedric Harrison of two counts of first degree murder. (Pen. Code, § 187.)[1] The jury found true a multiple-murder special-circumstance allegation (§ 190.2, subd. (a)(3)) and further found that defendant personally used a handgun to commit both murders (§ 12022.5, subd. (a)). Defendant admitted allegations that he had five prior convictions: for rape (§ 261), oral copulation (§ 288a), kidnapping (§ 207), assault with intent to commit a felony (§ 220), and robbery (§ 211). On the prosecution's motion, the court struck two other prior-conviction allegations. The jury deadlocked at the penalty phase, and the court declared a mistrial. After retrial of the penalty phase, a different jury returned a verdict of death. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment in its entirety.

I. FACTS

A. *Guilt Phase*

In the early morning hours of April 27, 1987, Betty Thompson and Leroy Robinson were shot to death in Oakland. The prosecution presented evidence that defendant killed them over a purchase of a small rock of what was supposed to be crack cocaine, but apparently was not.

1. *Prosecution's case*

In the spring of 1987, defendant lived in Oakland, California. He used drugs and sold cocaine with his friend and neighbor, Olin Davis. Defendant and Davis sometimes exchanged cocaine for sexual favors from women. Defendant always carried a .38-caliber revolver.

Murder victim Betty Thompson also lived in Oakland with her 16-year-old son and her seven-year-old daughter. She was a habitual cocaine and heroin user. Shortly before her murder, she began dating murder victim Leroy Robinson, another drug user and the other murder victim in this case.

On March 20, 1987, Oakland Police Officers Richard Hassna and Michael Yoell saw defendant standing in a parking lot known for drug problems and shootings. Defendant looked toward the patrol car and began running. As he ran, defendant pulled out a revolver and threw it in a nearby planter box. He eventually stopped and was arrested. Officers recovered six unexpended .38-caliber rounds from defendant's front pants pocket, and retrieved a

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

blue-steel .38-caliber revolver with a two-inch barrel and a brown plastic grip from the planter box. The revolver had six unexpended rounds in its cylinder.

On April 25, 1987, defendant and Davis saw Thompson in front of Thompson's house on 85th Avenue. Defendant introduced Thompson to Davis, who invited Thompson to his house. That evening, Thompson visited Davis's house with her young daughter. While Davis's roommate watched Thompson's daughter, Thompson and Davis went into the bedroom; Thompson performed oral sex on Davis in exchange for rock cocaine. About 9:00 p.m., Davis walked Thompson and her daughter home. Later that night, defendant stopped by Davis's house with Richard ("Shorty") Johnson, and Davis related what had occurred earlier with Thompson.

Around 11:00 o'clock the next evening, Ralph Rivera, a heroin addict who had known Thompson for years, visited Thompson at her home. At some point, Leroy Robinson came to the house, and Thompson introduced him to Rivera. After 30 minutes, two male friends of Thompson's joined them. Rivera described one of the men (Richard Johnson) as about five feet six inches tall, about 150 to 160 pounds in weight and of stocky build, with shoulder-length hair in jheri curls. The other man, whom Rivera later identified in a live lineup as defendant, was about six feet tall, had a thin mustache and a nearly shaved head, and was older and lighter skinned than Johnson.

Rivera heard Johnson talking to Thompson. Although he did not understand the slang they used, he believed Thompson was agreeing to get drugs for Johnson. Johnson then left, followed shortly thereafter by Thompson and later by defendant.

Ten minutes later Thompson returned, and after about five minutes defendant and Johnson also came back. Thompson spoke to Johnson and handed him a small white pebble. As defendant stood near the door, Johnson, who appeared upset, asked: "What's this?" Thompson replied: "Well, that's what they gave me." Johnson asked where she got it, and she said she got it "around the corner." Defendant, who also appeared upset, loudly asked Johnson: "Well, what do you want to do?" Johnson angrily said: "Well, let's go and see about getting the money back." Everyone except Rivera left.

About 2:45 a.m. on April 27, 1987, Lisa McKaufman, who lived with her infant daughter and boyfriend Kenneth Burnside in her apartment in Oakland, was awakened by a knock on her kitchen window and the sound of voices. She woke Burnside. When someone then knocked on the front door, Burnside got up and asked who it was. A female voice answered: "Open the door, it's Betty." Burnside opened the door to find Thompson and Robinson. Thompson

asked if Burnside was selling drugs, and Burnside said he was not. Robinson then pushed Thompson forward into the apartment. Scared, McKaufman spoke up and also denied selling drugs. When the baby started crying, Thompson said: "Okay, it's cool," and she and Robinson left. As they did so, McKaufman saw behind them a shadow of a man of average height wearing a beanie cap. As Burnside locked the front door, McKaufman heard Robinson say, "This is bullshit," and heard Thompson scream. McKaufman then heard three or four gunshots, apparently coming from behind the apartment complex. McKaufman called the police.

The gunshots were also heard by Oakland Police Officer Patricia Fuller, who was nearby in a parked patrol car. When she arrived at the scene, she saw Thompson near a car in the driveway, curled in a fetal position on the ground, gasping for breath, bleeding from the head, and holding her hands over her ears. Some six feet away from Thompson was Robinson, who was lying on the ground with his face up; he was bleeding from his head and ear. His dentures lay a foot away.

Thompson died of two gunshot wounds to the head. She also had a gunshot wound in a finger of her right hand. Stippling, or imbedded gunpowder grains, in the surface of the skin of that hand indicated that it was no more than four inches from the weapon that fired the fatal shots. Robinson died from a single gunshot through his mouth and into his head; the front of the barrel of the gun was inside his mouth when the shot was fired. The bloodstream of each victim contained cocaine metabolite, indicating they had ingested cocaine between six and 24 hours before their deaths. At the time of his death, Robinson had a blood-alcohol level of .08 percent.

The lead core and the copper-colored jacket of a bullet, as well as several bullet fragments, were recovered from Thompson's head, while a solid lead slug was recovered from Robinson's head. A criminalist and expert in firearms identification testified that the slugs were either .38 special or .357 magnum caliber rounds. He further concluded that one of the bullet fragments recovered from Thompson's head and the solid lead slug recovered from Robinson's head were fired from the same firearm. The copper-jacketed bullet recovered from Thompson's head was fired from a .38 special or .357 magnum firearm having characteristics similar to that which fired the other slugs. But the criminalist could draw no conclusion as to whether it was fired from the same firearm as the other two slugs, because the presence of the copper jacket made further comparison impossible.

On the day after the two murders, defendant came to his friend Olin Davis's house and told him he had shot Thompson and "her old man." Defendant said that he had grabbed Thompson and shot her in the back of the

head twice with his revolver, and that he had grabbed Robinson and shot him in the throat. Defendant said "Shorty" was with him at the time. After telling Davis to keep the information to himself, defendant left. The next day, early in the afternoon, defendant came by again and handed Davis a plastic-wrapped newspaper clipping of the double murder, saying: "Look, see."

Sometime between April 27 and May 4, 1987, Richard Johnson came to Davis's house and said he was present when defendant committed the murders. He also told Davis to keep "everything" to himself.

On April 29, 1987, two days after the murders, Robert Williams went to Davis's home and, while Davis was asleep in the bedroom, smoked cocaine. About 20 minutes later, defendant and Richard Johnson came in the house and injected heroin. Williams overheard Johnson tell defendant, "You know he told on him." Defendant said: "I ought to go kill him now," referring to Davis. Williams woke Davis and said: "You better get up and watch yourself." Williams then left.

On May 2, 1987, Davis went to the home of his drug supplier, Jesse Slaughter, to get cocaine for several buyers. Slaughter gave Davis five or six rocks of cocaine worth about $100, a sum that Davis was to pay Slaughter after selling the rocks. Davis sold one rock from the package and later replaced it with another rock he obtained elsewhere. The next morning, Davis gave the package to Williams to give to Slaughter. But later that day, Slaughter sought Davis out and threatened to kill him if he did not pay him the $100 owed. Davis explained that he gave the package to Williams to return to Slaughter, but Slaughter denied receiving the package.

Two days later, on May 4, 1987, Davis hid outside Slaughter's house to wait for Williams. As soon as Williams came out, Davis beat him up. As Davis walked away, Williams chased after him with a gun. Running, Davis fell; Williams fired the gun, but the gun jammed. Davis ran to a telephone booth and called police. While he did so, Williams set fire to Davis's house. As Davis walked back toward his house after calling the police, Williams caught up with him and fired the gun, which again jammed. Williams started hitting Davis with the gun, and the two fought. Slaughter ran toward them and broke up the fight by shooting his own gun into the ground.

Davis went to Highland Hospital for injuries he suffered during the fight. When he called his mother, she told him she had heard there was a "contract out" on him because he was pressing charges against Williams for arson. Davis's brother Bruce picked him up from the hospital and drove him to defendant's house. Davis thought that if there was a contract out on him, defendant would know about it.

Davis and Bruce arrived at defendant's house about 9:00 p.m. Davis told defendant there was a contract out on him. Defendant suggested Davis and Bruce ride with him and his brother so they could talk about the contract. Davis refused. He and Bruce then drove toward their mother's house, followed by defendant and his brother Ronald Gino Harrison (Gino) in their station wagon. Because Davis did not want defendant to know where his mother lived, he got out of the car and entered the back seat of the station wagon.

At some point, Gino, who was driving, stopped at a convenience store. When Gino walked into the store, defendant got in the back seat next to Davis by shoving him over with his shoulder. As defendant did so, his .38-caliber revolver fell out. Defendant quickly picked up the revolver.

Gino returned to the car and handed each person a can of beer. Defendant returned to the front passenger seat. Gino drove to a park near Merritt College. As soon as the car stopped, defendant jumped out, opened the back passenger-side door, and told Davis, "You're through." Defendant was holding his revolver in his right hand, with the barrel pointed in the air. He then pulled Davis out by his collar and threw him against the car. Davis grabbed defendant's gun-holding hand. As the two struggled, Gino grabbed Davis's calves. Defendant overpowered Davis and fired, hitting Davis in the lower chin. When Davis continued struggling, defendant fired again but missed. Davis broke loose and ran, hearing two or three shots whizzing by him.

Davis ran to a residential area and started banging on doors. At the second house he approached, a woman came to the door and, seeing his bleeding face, screamed. Davis slipped to the ground. The police arrived shortly thereafter.

Oakland Police Officer Gus Galindo spoke to Davis. Davis's face was bloody and mangled, with pieces of teeth stuck on his face. Unable to speak, Davis wrote down defendant's physical description, the location of defendant's house, and the description of the station wagon. At Highland Hospital, Davis wrote a note to the police that he knew who had killed Betty Thompson.

Shortly after 10:00 p.m., Oakland Police Officer Robert Earl Williams, Jr., went to the home of defendant's mother to talk to defendant. Defendant was sitting on the porch; his right arm was bleeding. Defendant said he and his brother had been standing in front of the house when someone drove by and shot him, but he could not give any details about the incident. Officer Williams saw a blue station wagon parked in the driveway next door, with what appeared to be a gunshot through the right rear window. The hood of

the station wagon was very warm, indicating that the car had recently been driven; fresh droplets of blood stained the driver's seat. Officer Williams arrested defendant and took him to Highland Hospital for medical treatment.

The next day, May 5, 1987, Sergeant Daniel Voznik, who was investigating the Thompson/Robinson murders, saw the police report on the Davis shooting and went to Highland Hospital to talk to Davis. Because Davis's face was heavily bandaged, he was unable to speak, and he responded to police questioning by writing his answers on paper. Davis wrote that defendant had visited him on April 28, 1987, had told him about the Thompson/Robinson murders, and had shown him a newspaper clipping about the murders. Davis further wrote that defendant said he and Richard Johnson had killed the victims over heroin.

On May 7, 1987, police officers executed a warrant to search the home of defendant's mother. They recovered 14 rounds of .38-caliber ammunition, as well as .22-caliber and .25-caliber ammunition, but found no guns.

The next day, after his discharge from the hospital, Davis led the police to the location where defendant had shot him. Nearby on the ground were Davis's earlier hospital discharge and prescription papers, which he had with him while riding with defendant in the station wagon; his tennis shoes, which had fallen off during his struggle with defendant; and a .38-caliber bullet.

Robert Williams testified for the prosecution at defendant's preliminary hearing. Before taking the witness stand, he saw defendant outside the holding cell in the courthouse. Defendant told Williams to keep his mouth shut and not to say anything about having seen defendant with a gun, adding he knew where Williams lived. Williams understood this to be a threat.

### 2. *Defense case*

By highlighting inconsistencies in Olin Davis's testimony and attacking Richard Johnson's credibility, the defense tried to show that Johnson, not defendant, had killed Betty Thompson and Leroy Robinson.

Sergeant Voznik testified that he met with Johnson and his attorney on May 12, 1987. Voznik told Johnson that he would be treated as a suspect, and that the police would review any statement he gave before determining the extent of his culpability. When Johnson refused to give a statement, Voznik arrested him. After spending the night in jail, Johnson changed his mind and agreed to talk to Voznik. Johnson told Voznik that he was at Thompson's house when defendant gave Thompson money to buy cocaine. Later that night, after going to Lisa McKaufman's apartment, defendant walked to the alley and asked .

Thompson, "Betty, may I speak to you for a minute?" Defendant then took a gun from his pants, pulled Robinson to him, and shot him in the neck. Thompson screamed and dropped to the ground in a fetal position. Defendant straddled Thompson and shot her at least twice.

Stephen Stephanopoulos, an investigator with the Alameda County District Attorney's Office, testified he spoke with Johnson in October 1991. Johnson said that his statement to the police implicating defendant was a lie, and that he did not know anything about the murders because he was not there.

Andre Jackson, incarcerated on a charge of burglary at the time of defendant's trial, testified that in March 1985, Johnson accused him of owing Johnson's sister money for drugs, grabbed him by his chest with one hand, and pointed a .38-caliber gun at his chest. Jackson broke free, and Johnson fired several shots at him.

Psychiatrist Harry Kormos testified about the effects of substance abuse on the brain. As the amount of cocaine in the body increases, because of increased dosage or repeated usage, psychiatrically abnormal behavior such as agitation, impatience, inability to focus or concentrate, paranoia, and misinterpretation of information becomes more common. Dr. Kormos explained that a cocaine user is likely to be disoriented as to time and impaired in perception, recollection, and communication, and that these mental impairments are more pronounced in chronic users of cocaine. He defined a chronic user as someone who abuses substances often enough, although not necessarily daily, that his or her life is dominated by them and his or her thinking is more or less permanently altered. Based on the testimony of Olin Davis regarding his use of cocaine, Dr. Kormos concluded that Davis was a chronic cocaine user.

The defense also presented evidence that on May 4, 1987, defendant and Davis each shot the other during the fight in the park. Charles Morton, an expert in the fields of firearms identification, criminalistics, and ballistics, analyzed the shirt defendant was wearing when he was shot in the arm. In his view, the gun had been in contact with the shirt at the time it was fired. He concluded the bullet hole in the shirt was too small to have been made by a .38-caliber bullet, and thus could not have been caused by defendant accidentally shooting himself while struggling with Davis.

B. *Penalty Phase Retrial*

1. *Prosecution's case in aggravation*

The prosecution generally reprised its guilt phase evidence, either by calling the same witnesses or by reading into the record the guilt phase

testimony of witnesses who were unavailable at the penalty phase. It also presented the following evidence relevant to section 190.3, factor (b) (other violent criminal conduct) and factor (c) (prior felony convictions):

Dorothy Mary Poynter testified that on January 11, 1977, defendant snatched her purse and fled.

On the night of July 4, 1979, 14-year-old Marcia J. and her friend Linda accepted a ride home from Linda's acquaintance Randy. The girls got into a van, which defendant was driving. A third man was sitting in the front passenger seat. Randy began sexually assaulting Linda, who jumped out of the van when it stopped at some point. Randy forced Marcia, who was still in the van, to orally copulate him. He then raped her, as did defendant and the third man. The parties stipulated that in December 1979, defendant pleaded guilty to three counts of rape (§ 261), one count of oral copulation (§ 288a), one count of assault with intent to commit a felony (§ 220), and one count of kidnapping (§ 207). Defendant was sentenced to five years in state prison for these offenses and was discharged from parole in 1986.

On June 30, 1981, a prison riot broke out at the California Correctional Center in Susanville, where defendant was incarcerated. While searching the dorms and dorm lockers of all inmates, prison guards recovered from defendant's locker a 10 1/2-inch-long, inmate-manufactured wooden shank, which was sharpened to a point on one end. This led to the filing of a rules violation report against defendant.

Murder victim Betty Thompson's younger sister, Patricia Rayfield, testified she raised her sister's two children after the murder, receiving financial assistance that offset only a portion of the costs of their upbringing. Thompson's son Kendall Gibbs testified he missed his mother very much.

### 2. Defense case in mitigation

The defense offered evidence similar to that presented at the guilt phase, attempting to raise a lingering doubt that defendant was the shooter and pointing instead to Richard Johnson as the actual shooter. The defense tried to discredit Johnson's statement to police identifying defendant as the killer, and highlighted inconsistencies in Olin Davis's testimony and statements to police.

## II. PRETRIAL ISSUES

### A. Speedy Trial

In 1987, the trial court appointed Jon Rolefson as counsel for defendant. On December 5, 1990, when the trial court commented on the need for "a

July setting date," the clerk suggested July 15, 1991, and defense counsel, identified in the reporter's transcript as "Don Rawlston," stated, "July 15th is fine." The court continued the case to July 15, 1991, to set for trial. On December 24, defendant moved for self-representation under *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525], and the court granted the motion. The court also stated it would "maintain all the court dates." On February 28, 1991, the matter was continued to July 15, 1991. Thereafter, defendant moved to give up his self-representation status; the court granted the motion on April 16, 1991, and appointed Albert Meloling as counsel.

Defendant contends he was denied the right to a speedy trial in violation of section 1382, the Sixth Amendment to the federal Constitution, and article I, section 15 of the California Constitution. He claims the continuance granted on December 5, 1990, was improper because it was agreed to not by Jon Rolefson, his appointed counsel, but by Don Rawlston, a purported stranger to the case who had no authority to appear on his behalf. He also claims the continuances on December 24 and February 28, obtained while he represented himself, were ineffective because the trial court did not obtain his personal waiver of the right to a speedy trial.

The Sixth Amendment to the federal Constitution, as applied to the states through the due process clause of the Fourteenth Amendment (*Klopfer v. North Carolina* (1967) 386 U.S. 213, 222–223 [18 L.Ed.2d 1, 87 S.Ct. 988]), guarantees a criminal defendant the "right to a speedy and public trial." Similarly, article I, section 15 of the California Constitution guarantees an accused the "right to a speedy public trial." The California Legislature has "re-expressed and amplified" these fundamental guarantees by various statutory enactments, including Penal Code section 1382. (*Townsend v. Superior Court* (1975) 15 Cal.3d 774, 779 [126 Cal.Rptr. 251, 543 P.2d 619].) At the time of the December 1990 continuance, section 1382 provided in pertinent part: "The court, unless good cause to the contrary is shown, shall order the action to be dismissed in the following cases: [¶] . . . [¶] (b) When a defendant is not brought to trial in a superior court within 60 days after the . . . filing of the information . . . . [¶] . . . [¶] (d) If the defendant is not represented by counsel, the defendant shall not be deemed under this section to have consented to the date for the defendant's trial unless the court has explained to the defendant his or her rights under this section and the effect of his or her consent." (Stats. 1987, ch. 577, § 1, pp. 1889–1891.) If the defendant is represented by counsel, counsel has the authority to waive defendant's statutory right to a speedy trial, at least in the absence of evidence showing incompetence of counsel. (*People v. Wright* (1990) 52 Cal.3d 367, 389 [276 Cal.Rptr. 731, 802 P.2d 221].) "Moreover, a defendant's failure to timely object to the delay and thereafter move for dismissal of the charges is normally deemed a waiver of his right to a speedy trial." (*Ibid.*)

The reporter's transcript shows that on December 5, 1990, "Don Rawlston" appeared on defendant's behalf. The clerk's minutes for that date, however, indicate that appointed counsel Jon Rolefson appeared, but they do not say whether defendant was present. Defendant argues that because the clerk's minutes are inconsistent with the reporter's transcript as to the identity of the attorney who appeared on December 5, we must assume that "Don Rawlston," not Jon Rolefson, appeared on his behalf. "Rawlston," he asserts, was not his lawyer and thus lacked the authority to waive his right to a speedy trial.

■ As a general rule, a record that is in conflict will be harmonized if possible. (*People v. Smith* (1983) 33 Cal.3d 596, 599 [189 Cal.Rptr. 862, 659 P.2d 1152].) If it cannot be harmonized, whether one portion of the record should prevail as against contrary statements in another portion of the record will depend on the circumstances of each particular case. (*Ibid.*)

Here, no irreconcilable conflict appears in the record. Defense counsel's name obviously was misspelled in the reporter's transcript. Indeed, the cover page of the volume containing the transcript of the December 5, 1990, proceeding lists defense counsel as "Don Ralston," not "Don Rawlston" as stated in that transcript. And, as the Attorney General points out, the miscellaneous reporter's transcript volume that contains the transcript of the December 5 proceeding contains similar typographical errors, listing defense counsel at times as "John Rolefson" or "Jon Rolofson." Appointed counsel's actual name was Jon Rolefson. It is thus clear that no one other than court-appointed counsel Jon Rolefson appeared on December 5, 1990, and on that date agreed to a continuance to July 15, 1991.

■ As for the proceeding on December 24, 1990, defendant contends that once the trial court granted his *Faretta* motion, the act of setting the matter over to the next court date—July 15, 1991—was a continuance requiring a waiver of his right to a speedy trial, notwithstanding the court's statement that it would "maintain all the court dates." Defendant cites no support for his position, and we reject it. When a trial court grants a defendant's motion for self-representation, it is not required to set aside scheduling decisions agreed to by the defendant's previous counsel.

Defendant contends that the continuance on February 28, 1991, to July 15, 1991, violated section 1382, subdivision (c). Not so. As stated, defense counsel previously had agreed to continue the matter to July 15, when the court would set a trial date. Although the clerk's minutes for February 28, 1991, stated that the matter was "continued" to July 15, the announcement of this court date merely reiterated a trial setting date to which defense counsel had agreed on December 5, 1990.

██ Defendant also claims federal and state constitutional violations of his right to a speedy trial because he did not personally waive his speedy trial right when, on December 5, 1990, the trial court continued the case to July 15, 1991. To determine whether defendant's federal right was violated, we evaluate the length of the delay, the reason for the delay, defendant's assertion of his right, and the prejudice to defendant. (*Barker v. Wingo* (1972) 407 U.S. 514, 530 [33 L.Ed.2d 101, 92 S.Ct. 2182]; *People v. Seaton* (2001) 26 Cal.4th 598, 633 [110 Cal.Rptr.2d 441, 28 P.3d 175].) Although no reason for the delay appears on this record, its length is not atypical for a capital case, as such cases generally require extensive preparation for trial. Most significantly, defense counsel agreed to the July 1991 trial setting date. Defendant does not claim any prejudice from the relatively minor delay. We thus reject defendant's federal constitutional claim, and we reject his state constitutional claim on the same basis. (See *People v. Martinez* (2000) 22 Cal.4th 750, 755–756 [94 Cal.Rptr.2d 381, 996 P.2d 32] [absent a violation of a statutory speedy trial provision, a defendant must make a showing of specific prejudice to establish a violation of the state Constitution's speedy trial right].)

B. *Excusal of Prospective Juror Elaine Q.*

Defendant contends he was denied the right to a guilt phase trial by an impartial jury, under the Sixth and Fourteenth Amendments to the federal Constitution and under article I, section 16 of the California Constitution, because, according to him, the trial court improperly excluded for cause Prospective Juror Elaine Q. based on her attitude toward the death penalty.

██ In *Wainwright v. Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844], the United States Supreme Court held that a prospective juror may be excluded for cause when the juror's views on capital punishment "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Id.* at p. 424, quoting *Adams v. Texas* (1980) 448 U.S. 38, 45 [65 L.Ed.2d 581, 100 S.Ct. 2521].) We have adopted that standard in determining whether a defendant's state constitutional right to an impartial jury was violated by an excusal for cause. (*People v. Ghent* (1987) 43 Cal.3d 739, 767 [239 Cal.Rptr. 82, 739 P.2d 1250]; see also *People v. Ashmus* (1991) 54 Cal.3d 932, 962 [2 Cal.Rptr.2d 112, 820 P.2d 214].) The trial court's determination of the juror's state of mind is binding on appeal if the juror's statements are equivocal or conflicting. If the juror's statements are not inconsistent, we will uphold the court's ruling if it is supported by substantial evidence. (*People v. Jones* (2003) 29 Cal.4th 1229, 1247 [131 Cal.Rptr.2d 468, 64 P.3d 762].)

We find no error here. Several times during voir dire, Prospective Juror Elaine Q. said she could not vote for the death penalty, although she hedged

her answer by stating that "maybe" she could not do so. At the end of voir dire, she stated: "I would find it very, very difficult [to vote for the death penalty], but I could probably do it. I mean, that's as good as I can come." After the prosecutor challenged Prospective Juror Q. for cause, the trial court noted that she was "quite uncomfortable" during questioning and that "the record may not reflect the physical manifestations of her anxiety." Under these circumstances, the court's determination of Prospective Juror Q.'s state of mind is binding. (See *People v. Jones, supra,* 29 Cal.4th at p. 1247.)

Defendant maintains Prospective Juror Q. should not have been dismissed simply because she had serious doubts about the propriety of the death penalty. He argues that removing prospective jurors with views comparable to Prospective Juror Q. "tilts the jury toward conviction." But the trial court did *not* dismiss Prospective Juror Q. because of her doubts about the death penalty, but because it found that those doubts would substantially impair her ability to follow the court's instructions. As defendant concedes, we have held that the state and federal Constitutions permit such "death qualification." (*People v. Jackson* (1996) 13 Cal.4th 1164, 1199 [56 Cal.Rptr.2d 49, 920 P.2d 1254].)

### III. Issues Related to Guilt and Special Circumstance

#### A. Admission of the Attempted Murder of Olin Davis

Defendant contends the trial court erred in admitting evidence of his attempted murder of Olin Davis, because such evidence was impermissible character evidence (Evid. Code, § 1101, subd. (a)), and because its prejudicial effect outweighed its probative value (Evid. Code, § 352). He also claims that its admission violated his federal constitutional right to a fair trial.

##### 1. Relevant proceedings

In addition to the Thompson/Robinson murders, defendant was originally charged in a third count with the attempted murder of Olin Davis, but the trial court granted defendant's motion to sever the attempted murder count from the two murder counts. The court noted that if the prosecution wanted to offer evidence relating to the attempted murder in the double murder trial, it could seek a hearing on its admissibility under Evidence Code section 1101.

At a later hearing regarding the admissibility of evidence of the attempted murder, the prosecutor proffered evidence that, two days after the double murder, Robert Williams overheard defendant tell Richard Johnson at Davis's house that he was planning to kill Davis because Davis knew defendant had killed Thompson and Robinson, and because Davis had been known to

provide information to the police. The prosecutor acknowledged he had not told the trial court of this evidence at the severance hearing. The court responded it had earlier ruled that Davis could testify about the circumstances that led him to give the police information about the two murders, and it ruled that Williams could testify about the conversation between defendant and Johnson. Moreover, because the prosecutor planned to present evidence that defendant's alleged motivation to kill Davis was clearly related to the two homicides, the court said it was "having a hard time thinking of any reason to limit any of the evidence in the third count." The court further stated that the extent to which the prosecutor wished to prove the attempted murder was "something that we can deal with witness by witness and objections at the time."

### 2. *Analysis*

█ "Relevant evidence" includes "evidence relevant to the credibility of a witness . . . , having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) In determining the credibility of a witness, the jury may consider, among other things, "[t]he extent of his capacity to perceive, to recollect, or to communicate any matter about which he testifies," "[t]he existence or nonexistence of a bias, interest, or other motive," and the witness's "attitude toward the action in which he testifies or toward the giving of testimony." (*Id.*, § 780, subds. (c), (f), (j).) "The credibility of a witness may be attacked or supported by any party, including the party calling him." (*Id.*, § 785.) But evidence of the good character of a witness "is inadmissible to support his credibility unless evidence of his bad character has been admitted for the purpose of attacking his credibility." (*Id.*, § 790.) And "[e]xcept as otherwise provided by statute, all relevant evidence is admissible." (*Id.*, § 351.)

█ Evidence Code section 1101, subdivision (a) generally prohibits the admission of a criminal act against a criminal defendant "when offered to prove his or her conduct on a specified occasion." Subdivision (b), however, provides that such evidence is admissible "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity . . .)." To be admissible, such evidence " 'must not contravene other policies limiting admission, such as those contained in Evidence Code section 352.' [Citation.]" (*People v. Ewoldt* (1994) 7 Cal.4th 380, 404 [27 Cal.Rptr.2d 646, 867 P.2d 757].) █ Under Evidence Code section 352, the probative value of the proffered evidence must not be substantially outweighed by the probability that its admission would create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (Evid. Code, § 352; *People v. Ewoldt, supra,* at p. 404.)

■ We review for abuse of discretion a trial court's rulings on relevance and admission or exclusion of evidence under Evidence Code sections 1101 and 352. (See *People v. Cole* (2004) 33 Cal.4th 1158, 1195 [17 Cal.Rptr.3d 532, 95 P.3d 811]; *People v. Lewis* (2001) 25 Cal.4th 610, 637 [106 Cal.Rptr.2d 629, 22 P.3d 392].)

■ Defendant here contends that evidence of the attempted murder of Olin Davis was irrelevant, and that the prosecutor used it in violation of Evidence Code section 1101, subdivision (a) to show defendant was of bad character and thus must have committed the double murders. He asserts this was precisely what the prosecutor argued to the jury. But, as the Attorney General notes, whether evidence was erroneously admitted does not depend on counsel's later argument to the jury.[2] Here, evidence of defendant's attempt to murder Davis was admissible under Evidence Code section 1101, subdivision (b) to prove his identity as the killer of Thompson and Robinson. Davis testified that a day or two after Thompson and Robinson were killed, defendant admitted to Davis that he killed them. And Robert Williams testified that a few days after the murders, he overheard defendant tell Richard Johnson that he (defendant) should kill Davis. Under these circumstances, defendant's attempt, a week after the double murders, to kill Davis—to whom he had admitted the murders—was probative of defendant's consciousness of guilt, which in turn was probative of his identity as the perpetrator of the charged offenses. (See *People v. Wilson* (1992) 3 Cal.4th 926, 940 [13 Cal.Rptr.2d 259, 838 P.2d 1212]; see also *People v. Farnam* (2002) 28 Cal.4th 107, 154 [121 Cal.Rptr.2d 106, 47 P.3d 988]; *People v. Arias* (1996) 13 Cal.4th 92, 127–128 [51 Cal.Rptr.2d 770, 913 P.2d 980].) The evidence of defendant's attack on Davis also bolstered the credibility of Davis's testimony that defendant told him he had killed Thompson and Robinson, because it explained why, after the attack, Davis told the police about defendant's admission, when he had not previously done so. (See Evid. Code, § 210 [credibility evidence is relevant].)

Defendant argues that even if evidence of his attempted murder of Davis was admissible to show consciousness of guilt, the probative value of this evidence, which was detailed and extensive, was substantially outweighed by its undue consumption of time and the probability of substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (Evid. Code, § 352.)

■ To preserve a claim that a trial court abused its discretion in not excluding evidence under Evidence Code section 352, "a party must make a timely and specific objection when the evidence is offered." (*People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1014 [30 Cal.Rptr.2d 818, 874 P.2d 248];

---

[2] We address defendant's claim of prosecutorial misconduct in part III.F, *post.*

accord, *People v. Valdez* (2004) 32 Cal.4th 73, 108 [8 Cal.Rptr.3d 271, 82 P.3d 296].) At trial, defendant objected both to the admission of photographs of Davis after he was shot by defendant and to the admission of the videotaped reenactment of the drive to the park as unduly prejudicial, but he otherwise posed no objections to the detailed testimony of the attempted murder. On appeal, defendant argues additional objections would have been fruitless. We disagree. At trial, when the court and the parties discussed the admissibility of evidence of the attempted murder of Davis, they appeared to agree that no specific objection or ruling could be made until a witness was ready to testify or a specific question on the matter was posed to a witness. Thereafter, defendant made no objection other than to the photograph of the injured Davis at the hospital and to the videotaped reenactment.

Defendant alternately argues he could not have objected under Evidence Code section 352 to the voluminous evidence of the attempted murder until all of the evidence had been admitted, at which point an objection and admonition would have been futile. Defendant's argument is specious. The purpose of a timely and specific objection to the admission of evidence is to prevent just such a result.

Even had defendant objected, the trial court would not have abused its discretion in admitting the evidence of the attempted murder of Davis. Davis testified at length about the events of May 4, 1987, including the fight with Robert Williams, his visit to defendant that night, his car trip with defendant and defendant's brother Gino, his struggle with defendant, his escape, and his discussions later with the police at the hospital. There was, however, no substantial danger of undue prejudice to defendant, of confusing the issues, or of misleading the jury. The court repeatedly instructed the jury it could not consider the evidence relating to the attempted murder of Davis as evidence of defendant's bad character or as showing he had a propensity to commit murders. During the opening statement of the defense, the court instructed the jury that defendant was not charged with the May 4, 1987, shooting of Davis, but that there would be evidence of that incident, which the jury was to consider in light of the instructions the court would give at the end of the trial. Before Davis testified on this subject, the court again instructed the jury that defendant was not charged with a crime relating to the May 4 incident, and that it should not consider the evidence in determining defendant's guilt of the charged double murder of Thompson and Robinson or as showing he was a person of bad character. The court further explained that such evidence was admitted for a limited purpose that included assisting the jury in evaluating Davis's testimony and fleshing out the relationship between Davis and defendant. Still later in Davis's testimony, in response to a juror's question, the court reiterated to the jury that the only issues to be decided were two counts of murder, and that the incident involving Davis on May 4, 1987, was admitted for a limited purpose, to be explained in detail later. Last,

after the close of evidence, the court instructed that if the jury found defendant had tried to suppress evidence against himself in this matter, such as by intimidating a witness or attempting to eliminate a witness, that attempt might be considered by the jury as a circumstance tending to show a consciousness of guilt, but that such conduct was not by itself sufficient to prove guilt. The court also told the jury that certain evidence had been admitted for a limited purpose and the jury could not consider such evidence for any purpose other than the limited purpose for which it was admitted.

## B. *Joinder of Counts*

Defendant argues the trial court "effectively vacated" its severance ruling and "de facto" tried him on two counts of murder and one count of attempted murder, in violation of his right to a fair trial. We disagree.

"Section 954, which governs joinder of counts in a single trial, provides: 'An accusatory pleading may charge . . . two or more different offenses of the same class of crimes or offenses, under separate counts . . . .' " "But section 954 also provides that 'the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses . . . be tried separately.' " (*People v. Sapp* (2003) 31 Cal.4th 240, 257–258 [2 Cal.Rptr.3d 554, 73 P.3d 433].)

Here, the trial court granted defendant's motion to sever the attempted murder count from the two murder counts. The trial of the attempted murder count trailed that of the Thompson/Robinson murder counts, and the court granted the prosecution's motion to dismiss the attempted murder charge after the penalty phase retrial. Defendant, however, argues that the court "effectively vacated" and "de facto denied" the severance motion because it admitted evidence of the attempted murder at the trial on the double murders. Defendant provides no authority for such a proposition, and no California court has so held. We decline to do so here. Defendant's claim is, in substance, a reformulation of his contention that the trial court erroneously admitted evidence of the attempted murder. For the reasons stated, the court did not abuse its discretion in admitting the evidence.

## C. *Admission of the Photograph of Davis*

At trial, defendant objected to People's exhibit No. 3D, a photograph depicting Davis on a gurney in the hospital after defendant had shot him, as irrelevant or, if relevant, unduly prejudicial under Evidence Code section 352. The trial court overruled the objection and admitted the photograph.

Defendant contends that the photograph was irrelevant because he did not dispute that Davis was shot in the mouth, and that the trial court should have

excluded it under Evidence Code section 352 because it was gruesome and cumulative to testimony from Davis and several police officers about the nature of the injury. As we shall explain, the court did not abuse its discretion in admitting the photograph.

 The admissibility of photographs is governed by the same rules of evidence used to determine the admissibility of evidence generally. (Evid. Code, §§ 210, 350; see also *People v. Heard* (2003) 31 Cal.4th 946, 972–973 [4 Cal.Rptr.3d 131, 75 P.3d 53]; *People v. Lewis, supra,* 25 Cal.4th at p. 641.) The trial court has broad discretion in deciding the relevancy of such evidence. (*People v. Lewis, supra,* at p. 641.)

The photograph showing Davis on a gurney in the hospital showed that Davis had been shot in the head. This corroborated Davis's testimony that defendant tried to kill him. Evidence that defendant tried to kill Davis, in turn, tended to show that defendant had killed Robinson and Thompson, based on the prosecution's theory that defendant tried to kill Davis because he feared that Davis would reveal defendant's identity as the killer of Robinson and Thompson to the police. Thus, the trial court did not abuse its discretion when it admitted the photograph as evidence relevant to prove defendant's guilt of the murders with which he was charged, and that was not merely cumulative of the testimony of Davis and the officers who observed Davis's wound. (See *People v. Smithey* (1999) 20 Cal.4th 936, 973–974 [86 Cal.Rptr.2d 243, 978 P.2d 1171].)

 We also reject defendant's argument that the trial court erred in not excluding it as more prejudicial than probative under Evidence Code section 352. The court's exercise of its discretion to admit assertedly gruesome or inflammatory evidence will not be disturbed on appeal unless the probative value of the evidence clearly is outweighed by its prejudicial effect. (*People v. Heard, supra,* 31 Cal.4th at pp. 975–976.) Having reviewed the photograph, we are satisfied that it is not unduly gruesome or inflammatory, and its admission did not violate state evidentiary law. (See *People v. Lewis, supra,* 25 Cal.4th at p. 642.)

### D. *Admission of the Videotaped Reenactment*

Defendant contends People's exhibit No. 73, a videotaped reenactment of the route to the location where defendant shot Davis on May 4, 1987, was cumulative to other evidence and unduly prejudicial, in violation of Evidence Code section 352.

The videotape, which had no sound, was made by the Alameda County District Attorney's Office on January 15, 1992, almost five years

after defendant shot Davis in the face. It was taken from a car similar to the station wagon in which defendant and his brother Gino Harrison transported Davis, with a police officer in the driver's seat taking the role of Gino, another officer in the front passenger seat taking defendant's role, and Davis in the back seat. The tape began at 98th Avenue and Bancroft, where Davis began his ride with the Harrison brothers, and ended at the park where Davis was shot, with the officers and Davis reenacting the fight.

At trial, the court held a hearing on defendant's motion in limine regarding the admissibility of the videotape. Defendant argued that the lighting conditions in the videotape, which was made in broad daylight, were unlike the conditions at the time of the shooting, which occurred at night, and that the videotape was thus improper demonstrative evidence. He also argued that the videotape was cumulative to testimonial and physical evidence and unduly prejudicial under Evidence Code section 352. The court concluded the difference in lighting did not make the videotape inadmissible, and stated: "[I]t helped me understand the testimony [of Davis] better, and I assume, therefore, it would help the jury, and it would be more real than looking at a map." But the court ruled that the end of the videotape, depicting the reenactment of the assault, should not be admitted because it was not made under the same lighting conditions and was not exactly as Davis described it. The redacted videotape ended with the station wagon stopping at the park, before anyone got out. Before playing the redacted videotape for the jury, the court instructed that the tape was not intended to show the lighting conditions or to attempt to "recreate the visual experience that occurred" but rather to show the route taken, as described by Davis. As the tape was played for the jury, the prosecutor questioned Davis about it.

In ruling on the admissibility of videotapes under Evidence Code section 352, " 'the court enjoys broad discretion in deciding whether prejudice substantially outweighs probative value.' [Citation.]" (*People v. Michaels* (2002) 28 Cal.4th 486, 532 [122 Cal.Rptr.2d 285, 49 P.3d 1032].)

Defendant's contention that the trial court erred under Evidence Code section 352 in admitting the videotape because it was cumulative of the testimonial and other physical evidence presented lacks merit. (See, e.g., *People v. Michaels, supra,* 28 Cal.4th at p. 532; *People v. Hart* (1999) 20 Cal.4th 546, 616 [85 Cal.Rptr.2d 132, 976 P.2d 683]; *People v. Scheid* (1997) 16 Cal.4th 1, 19 [65 Cal.Rptr.2d 348, 939 P.2d 748].) As the court noted, the videotape could assist the jury in understanding and evaluating Davis's testimony. Moreover, we have reviewed the videotape and do not find it unduly prejudicial. As the trial court observed, it merely depicted the route taken. Thus, the court did not abuse its discretion in admitting the videotape.

Defendant also contends that the admission of the videotape at the penalty phase retrial violated Evidence Code section 352. Because he failed to object to the admission of this evidence at the penalty phase retrial, he may not raise the issue for the first time on appeal. (*People v. Hart, supra,* 20 Cal.4th at p. 615.) Even if defendant had preserved the challenge, for the reasons discussed above, the trial court did not err in admitting the videotape.

### E. *Admission of Richard Johnson's Out-of-court Statements*

Defendant contends the trial court erroneously admitted one portion of Richard Johnson's statement to Olin Davis and certain portions of his statement to Sergeant Voznik. We address each of these contentions in turn.

#### 1. *Johnson's statement to Davis*

Defendant contends the trial court's admission of Johnson's statement to Davis that defendant killed Thompson and Robinson violated his right to confront witnesses against him as guaranteed by the Sixth Amendment to the federal Constitution and article I, section 15 of the California Constitution.

On direct examination by the prosecution, Davis testified that Johnson came to his house on Tuesday, April 28, 1987, after defendant had visited. On cross-examination, defense counsel asked, "And when you talked to [Johnson], he told you that he was there [when Thompson and Robinson were killed]?" The prosecutor objected on the ground of hearsay, and the trial court excused the jury and heard the parties' arguments regarding the proffered testimony.

Defendant's offer of proof was that Davis would testify Johnson told him he was present when Thompson and Robinson were killed and warned him not to tell anybody about it. Defense counsel acknowledged such testimony was hearsay, but sought to introduce it as a declaration against penal interest under Evidence Code section 1230. The parties stipulated Johnson was an unavailable witness, and defense counsel argued the proffered evidence was relevant to show that Johnson was present at the scene of the murders, had the opportunity to commit the murders, and ultimately committed the murders. The prosecutor responded that the statement defense counsel was trying to introduce was "completely out of context" and that, if the court admitted the statement, he would ask the court to admit Johnson's entire statement under Evidence Code section 356, because to do otherwise would be extremely misleading. The court asked the parties whether Johnson's entire statement to Davis would be admissible under Evidence Code section 356 if it ruled that defense counsel's question called for a proper declaration against penal interest. Defense counsel answered "yes" and noted that if the full

statement were admitted, the defense could bring in other hearsay statements to show prior consistent or inconsistent statements, acknowledging that doing so would be a tactical decision that the defense "would have to live with."

The trial court concluded that, based on defendant's offer of proof, Johnson's statement to Davis about his presence at the scene of the murders was a declaration against penal interest, and that it was prepared to rule such evidence relevant, "subject to the provisions of Evidence Code section 356 and other provisions regarding prior inconsistent and consistent statements without ruling on what else comes in." The court added that if the defense chose not to cross-examine Davis on the contents of the conversation, the issue could nevertheless become relevant in the defense case, subject to cross-examination and rebuttal evidence as to his prior consistent or inconsistent statements. Based on the court's ruling, the prosecutor withdrew his original hearsay objection.

The following then occurred during cross-examination of Davis by the defense:

"Q. After the conversation, did Rick [Johnson] tell you not to tell anybody about this particular conversation he was having with you?

"A. Yes.

"Q. And the conversation related to the homicides of Betty Thompson and her old man; is that correct?

"A. Yes.

"Q. And what Rick told you . . . was that he was present at the time of these particular murders, correct?

"A. Yes.

"Q. And then Rick proceeded to lay the murder on [defendant]; is that correct?

"THE COURT: Do you understand the question?

"[DAVIS]: No.

"THE COURT: Could you translate your slang and reframe your question.

"[DEFENSE COUNSEL]: The slang is, Rick blamed [defendant] for the murder; isn't that correct?

"[DAVIS]: Your Honor, can I answer the question—

"THE COURT: Yes.

"[DAVIS]:—and give—say something else?

"THE COURT: Well, yes, but start with—the question is, in this conversation you had with Rick, did he blame [defendant] for the murders, that's the question.

"[DAVIS]: Well, he said [defendant] did it, yes.

"THE COURT: What is it you wanted to explain?

"[DAVIS]: But what I want to explain is that when he said that [defendant] did it, I mean he just told me that he was there, [defendant] did it, and keep everything to myself, okay, that was it. But [defendant] had already told me he did it hisself [sic]."

Defendant contends the trial court erroneously admitted Johnson's hearsay statements because they were not proper declarations against penal interest excepted from the hearsay rule under Evidence Code section 1230, and because they violated his Sixth Amendment right to confront and cross-examine witnesses against him.

We need not decide whether the trial court erred in admitting Johnson's hearsay statements, for defendant invited any error. (See *People v. Riel* (2000) 22 Cal.4th 1153, 1214 [96 Cal.Rptr.2d 1, 998 P.2d 969]; *People v. Barton* (1995) 12 Cal.4th 186, 198 [47 Cal.Rptr.2d 569, 906 P.2d 531].) Defense counsel expressly acknowledged that eliciting testimony on the portion of Johnson's statement admitting he was at the scene of the crime was a tactical decision on their part, as they knew that admission of such evidence likely would mean that the portion of Johnson's statement attributing the murders to defendant would also be admitted to place the statement in context of the entire conversation between Johnson and Davis under Evidence Code section 356.[3] Defense counsel wanted the jury to learn that Johnson was present at

---

[3] Evidence Code section 356 provides: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; . . . and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence."

the scene of the crime so that they could later argue during closing argument that Johnson was the shooter.

### 2. *Johnson's statement to Sergeant Voznik*

Sergeant Voznik, a defense witness who had also testified for the prosecution, testified that on May 12, 1987, Johnson came to the police station with his attorney. Voznik told them that Johnson would be treated as a suspect and that, if Johnson wished to give a statement, the police would thereafter make a determination as to Johnson's involvement in the murders. Johnson asked to speak privately with Jesse Slaughter, who had come to the police station shortly after Johnson. Sergeant Voznik allowed Johnson, his attorney, and Slaughter to speak privately. Johnson then declined to give a statement to the police, and was arrested on an outstanding warrant. The next morning, Johnson telephoned Sergeant Voznik from jail and said he had changed his mind and wanted to make a statement. Voznik contacted Johnson's attorney, and the three met that afternoon at the police station. During the ensuing interview, Johnson told Voznik that, on April 27, defendant negotiated with Thompson about buying crack cocaine and gave her money for it. Johnson also said that he was present when Thompson and Robinson were killed and that defendant had killed them.

On cross-examination by the prosecution, Sergeant Voznik testified that his interview with Johnson was tape-recorded. The prosecutor marked for identification a 28-page transcript of Johnson's interview and referred to the transcript in questioning Voznik about the details of the interview. Johnson told Voznik that defendant shot Thompson and Robinson about 10:00 p.m. on April 27, 1987, in an alley outside the apartment of Lisa McKaufman. Defendant "snatche[d]" Robinson with his left hand, pulled a gun from the front of his pants with his right hand, placed the gun to Robinson's neck and fired one shot. Robinson "just drop[ped]," and Thompson lay on the ground in a fetal position "screaming and hollering." Defendant then straddled Thompson and shot her two to three times on the side of her head. Defendant did not object to any of this testimony.

When the prosecutor asked Sergeant Voznik where defendant went after shooting Thompson, defense counsel objected to the testimony as being "no longer within the realm of [Evidence Code section] 356." The trial court overruled the objection. Voznik then testified that Johnson said that defendant leaped past him after shooting Thompson. Without objection from the defense, Voznik also stated that defendant's gun was a rust-colored revolver with a three-inch barrel. The court sustained several of defendant's objections to identified portions of the Johnson interview as outside the scope of Evidence Code section 356 or as cumulative. Over defendant's objection that

the testimony was cumulative, Sergeant Voznik further testified that during the interview Johnson said that when defendant shot Robinson the gun was touching Robinson's neck, and when defendant shot Thompson the gun was two or three feet from Thompson's head.

Defendant contends that Johnson's statement to Sergeant Voznik providing details about the Thompson/Robinson murders, which the prosecutor elicited during cross-examination, was inadmissible hearsay. Because he did not object at trial on this ground, he has not preserved the issue for review. (See *People v. Hines* (1997) 15 Cal.4th 997, 1035 [64 Cal.Rptr.2d 594, 938 P.2d 388].) Even if the issue was properly before us, the contention lacks merit, as discussed below.

 "Evidence Code section 356 permits introduction of statements 'on the "same subject" ' or which are necessary for the understanding of the statements already introduced. [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 419–420 [133 Cal.Rptr.2d 561, 68 P.3d 1].) Accordingly, once defendant had introduced a portion of Johnson's interview with Sergeant Voznick into evidence, the prosecution was entitled to introduce the remainder of Johnson's interview to place in context the isolated statements of Johnson related by Voznik on direct examination by the defense. (See *People v. Zapien* (1993) 4 Cal.4th 929, 959 [17 Cal.Rptr.2d 122, 846 P.2d 704].) The trial court's admission of Johnson's statements was therefore proper under California statutory law.

 Defendant also contends that by admitting the statement the trial court violated his right to confront and cross-examine witnesses against him, under the Sixth Amendment to the federal Constitution and article I, section 15 of the California Constitution. Even if he has not forfeited this claim by his failure to raise it at trial, the claim lacks merit. Recently, the United States Supreme Court stated that when testimonial hearsay evidence, which includes "[s]tatements taken by police officers in the course of interrogations" (*Crawford v. Washington* (2004) 541 U.S. 36, 52 [158 L.Ed.2d 177, 124 S.Ct. 1354, 1364]), is at issue, the "Sixth Amendment demands . . . unavailability [of the declarant] and a prior opportunity for cross-examination" (*id.* at p. 68). But the high court has not said whether *Crawford* applies to cases that, like this one, were tried before it was decided. Assuming for the sake of argument that under *Crawford*, admission of Johnson's statements to Voznik violated the Sixth Amendment, admission of the statements would require reversal unless we found beyond a reasonable doubt that the jury verdict would have been the same absent any error. (*Neder v. United States* (1999) 527 U.S. 1, 7–10 [144 L.Ed.2d 35, 119 S.Ct. 1827]; see also *People v. Bolden* (2002) 29 Cal.4th 515, 560 [127 Cal.Rptr.2d 802, 58 P.3d 931].)

Under that standard, any error in admitting Johnson's statements was harmless. The important factual issue at trial was identity, not the manner in which the victims were killed. On this point, defendant himself elicited from Sergeant Voznik the statement by Johnson identifying defendant as the shooter, which was consistent with defendant's admission of guilt to Davis. The details of the murders provided by Davis, as relayed to him by defendant, were largely identical to the details provided by Johnson, but for the order in which the victims were killed. The locations and the analysis of the victims' wounds corroborated evidence that they were killed at very close range. Under these circumstances, we are satisfied beyond a reasonable doubt the jury's verdict would have been the same absent the admission of evidence elicited by the prosecution on cross-examination of Voznik about the details of Johnson's statement to him.

## F. *Prosecutorial Misconduct*

Defendant accuses the prosecutor of misconduct before and during trial, thus violating his rights to a fair trial and due process under the state and federal Constitutions.

### 1. *Procuring Richard Johnson as a witness*

Defendant contends the prosecution "frustrated" his efforts to call Richard Johnson as a defense witness. He asserts the prosecution behaved "irresponsibly" by stating before trial that it would call Johnson as a witness, only to tell the defense, after jury selection had been completed and four days before opening statements, that it would not call him after all. At this point the defense, which wanted to call Johnson as a witness, began an unsuccessful effort to locate him.

After the evidentiary portion of trial was under way, the parties stipulated that they each had "exercised due diligence" in attempting to locate Johnson to testify at trial, and that he was an unavailable witness under Evidence Code section 1230. As further evidence that Johnson was unavailable the trial court noted that Johnson had failed to appear at a probation revocation hearing, as a result of which the superior court had issued a no-bail bench warrant for his arrest.

Defendant's contention that the prosecution frustrated his efforts to call Johnson lacks merit. Before trial began, the parties and the court discussed potential evidence pertaining to Johnson. At that time the prosecutor noted that Johnson could not be found, that he had "received information as to where Johnson might be staying," and that he had "given this information to the defense." The prosecutor did nothing to prevent defendant from attempting to find and subpoena Johnson. Although defendant claims the prosecutor

acted in bad faith by waiting until after jury selection to say he would not call Johnson to testify, we see no evidence of bad faith. The defense was responsible for securing the presence of any witness it wanted to call at trial, regardless of whether the prosecution would also be using that witness. If the defense wanted to ensure that Johnson would be available to testify, it could have begun looking for him at any time, without waiting to see whether the prosecution would also call him.

Defendant also claims that the prosecution had a duty to undertake reasonable good faith efforts to locate Johnson, and that it violated this alleged duty. But defendant made no such claim at trial. Indeed, as explained above, he stipulated that both parties had "exercised due diligence" in attempting to locate Johnson. Defendant therefore has not preserved the issue for appeal. (See *People v. Thornton* (1974) 11 Cal.3d 738, 763 [114 Cal.Rptr. 467, 523 P.2d 267] [involving discovery rights].)

### 2. *Richard Johnson's statements to police*

When the police interviewed Richard Johnson in May 1987, he said he saw defendant kill Thompson and Robinson, and he described in detail the manner of the killings. Later, in October 1991, Johnson told an investigator from the district attorney's office he knew nothing about the murders because he was not there. He said that he had lied to the police in May 1987.

At trial, during a discussion in chambers regarding the admissibility of certain evidence not relevant here, this colloquy occurred:

"[THE PROSECUTOR]: [W]hen [Johnson] gave his statement to the police after a day and a half in custody, he got as far—he sanitized himself as much as he possibly could. He laid everything on [defendant], and, in his own words, he said basically he was just standing there.

"THE COURT: Which belies—

"[THE PROSECUTOR]: *It belies common sense, belies the truth, it belies everything.*" (Italics added.)

Later, when cross-examining Sergeant Voznik, the prosecutor elicited the detailed description of the murders that Johnson had given to Voznik in May 1987. Defendant contends the prosecutor engaged in misconduct by eliciting this description, because he had previously expressed the view, in the discussion quoted above, that Johnson's statements were false, and because he knew that Johnson had later recanted his statements. Defendant failed to preserve this issue for appeal because he did not object to that testimony at

trial. (*People v. Crew* (2003) 31 Cal.4th 822, 839 [3 Cal.Rptr.3d 733, 74 P.3d 820].) In any event, there was no prosecutorial misconduct.

■ A prosecutor's misconduct violates the Fourteenth Amendment to the federal Constitution when it "infects the trial with such unfairness as to make the conviction a denial of due process." (*People v. Morales* (2001) 25 Cal.4th 34, 44 [104 Cal.Rptr.2d 582, 18 P.3d 11]; accord, *Darden v. Wainwright* (1986) 477 U.S. 168, 181 [91 L.Ed.2d 144, 106 S.Ct. 2464]; *Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 643 [40 L.Ed.2d 431, 94 S.Ct. 1868].) In other words, the misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." (*United States v. Agurs* (1976) 427 U.S. 97, 108 [49 L.Ed.2d 342, 96 S.Ct. 2392].) A prosecutor's misconduct "that does not render a criminal trial fundamentally unfair" violates California law "only if it involves ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " (*People v. Espinoza* (1992) 3 Cal.4th 806, 820 [12 Cal.Rptr.2d 682, 838 P.2d 204]; accord, *People v. Farnam, supra,* 28 Cal.4th at p. 167.)

■ "Under well-established principles of due process, the prosecution cannot present evidence it knows is false and must correct any falsity of which it is aware in the evidence it presents . . . ." (*People v. Seaton, supra,* 26 Cal.4th at p. 647.) But the prosecutor here did not *know* that Johnson's initial statement to the police was false; he merely suspected that was the case. When, as here, the prosecution has doubts as to the truth of a statement it intends to present at trial, it must disclose to the defense any material evidence suggesting that the statement in question is false. But, notwithstanding those doubts, the prosecutor may still present the statement to the jury, as we explained in *People v. Gordon* (1973) 10 Cal.3d 460 [110 Cal.Rptr. 906, 516 P.2d 298].

In *Gordon,* the prosecutor told the jury in his opening statement that he believed his chief witness "would not be telling the whole truth" because she would be testifying that the defendant was the sole perpetrator of the murder charged in that case, whereas the prosecutor suspected that the witness was actually an accomplice. (*People v. Gordon, supra,* 10 Cal.3d at p. 473.) We rejected the defendant's claim that the prosecutor violated his right to a fair trial by knowingly presenting perjured testimony, explaining that the prosecutor "did not *know*" (*id.* at p. 474) the witness was lying and that "the jury could decide for itself which of the conflicting versions of the incidents in question was true" (*ibid.*; see also *People v. Riel, supra,* 22 Cal.4th at pp. 1181–1182 [quoting *Gordon* with approval]).

Here, the prosecutor's comment about Johnson's statement to the police— "It belies common sense, belies the truth, it belies everything"—appears to

express the view that Johnson was lying when he claimed to be an innocent bystander, and that he actually assisted defendant in committing the murders. Thus, the prosecutor's doubts about the truth of Johnson's statement mirrored the doubts of the prosecutor in *Gordon* regarding the truthfulness of the latter's chief witness. But, as in *Gordon*, those doubts were based on the evidence presented at trial, not on facts of which the jury was unaware. (See generally *People v. Seaton, supra,* 26 Cal.4th at p. 648 ["So long as the prosecutor's doubts are *based solely on the evidence presented at trial,* the jury is capable of deciding which of the competing experts is the more convincing . . . ."].) Just as the prosecutor in *Gordon* was entitled to call his chief witness to testify, the prosecutor here was entitled to introduce Johnson's statement. The jury, which also heard from the defense that Johnson had later recanted his statement, could make its own decision as to Johnson's credibility.

 Defendant also contends the prosecutor had a duty under *Mooney v. Holohan* (1935) 294 U.S. 103, 112 [79 L.Ed. 791, 55 S.Ct. 340], and its progeny, to tell the jury that Johnson's account of the murders to Sergeant Voznik could not be believed because Johnson had repudiated it. It is true that "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.' " (*Giglio v. United States* (1972) 405 U.S. 150, 153 [31 L.Ed.2d 104, 92 S.Ct. 763], citing *Mooney v. Holohan, supra,* 294 U.S. at p. 112.) But as explained in the previous paragraph, the prosecutor did not deceive the court or jury by presenting evidence of Johnson's statements to the police.

### 3. *Closing argument*

Defendant contends the prosecutor engaged in misconduct when, in closing argument during the guilt phase, he ascribed various negative characteristics to defendant, argued at length about the uncharged March 1987 incident involving defendant's possession of a firearm, and (according to defendant) fabricated facts. He further contends the cumulative impact of the various acts of misconduct could not have been cured by an admonition, and the misconduct violated his state and federal constitutional rights to a fair trial.

### a. *Forfeiture*

At the threshold, the Attorney General contends defendant forfeited appellate review of all these claims. Defense counsel objected to only one of the prosecutor's allegedly improper remarks and in no case did he request an admonition or curative instruction.

 Defendant argues that a request for an admonition would have been futile and would not have cured the harm because the prosecutor's misconduct was pervasive. "A defendant will be excused from the necessity of either

a timely objection and/or a request for admonition if either would be futile. [Citations.] In addition, failure to request the jury be admonished does not forfeit the issue for appeal if ' "an admonition would not have cured the harm caused by the misconduct." ' [Citation.]" (*People v. Hill* (1998) 17 Cal.4th 800, 820 [72 Cal.Rptr.2d 656, 952 P.2d 673].) Here, however, defendant objected to virtually none of the prosecutor's purportedly improper statements and never sought an admonition. A timely objection and request for admonition at the first sign of any purported misconduct might have curbed the vigor of the prosecutor's argument. (See *People v. Dennis* (1998) 17 Cal.4th 468, 521 [71 Cal.Rptr.2d 680, 950 P.2d 1035].) Moreover, even if defendant had preserved the right to raise these claims on appeal, no reversal would be required, as discussed below.

### b. *Specific instances of misconduct*

When the issue "focuses on comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Berryman* (1993) 6 Cal.4th 1048, 1072 [25 Cal.Rptr.2d 867, 864 P.2d 40], overruled on another point in *People v. Hill, supra,* 17 Cal.4th at pp. 822–823; accord, *People v. Clair* (1992) 2 Cal.4th 629, 663 [7 Cal.Rptr.2d 564, 828 P.2d 705].) A prosecutor is given wide latitude during closing argument. The argument may be vigorous as long as it is a fair comment on the evidence, which can include reasonable inferences or deductions to be drawn therefrom. " 'A prosecutor may "vigorously argue his case and is not limited to 'Chesterfieldian politeness' " [citation], and he may "use appropriate epithets . . . ." ' [Citations.]" (*People v. Wharton* (1991) 53 Cal.3d 522, 567–568 [280 Cal.Rptr. 631, 809 P.2d 290].) "A defendant's conviction will not be reversed for prosecutorial misconduct . . . unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct." (*People v. Crew, supra,* 31 Cal.4th at p. 839.)

### i. *Epithets*

Defendant contends the prosecutor engaged in misconduct by arguing to the jury that defendant "enjoyed" killing Robinson; that he "enjoyed" killing Thompson "with the relish and degree [*sic*] of a little kid opening his toys at Christmas"; that he plotted to kill Davis because he "likes to kill," "likes to intimidate," and "likes to bully and strong-arm"; and that "in his glee," with "[h]is mind made up" to kill Davis, he "jumped into the back seat [with Davis], gun exposed to smell and feel the last bit of life he's going to take." These statements did not exceed the bounds of proper argument. Given the evidence that defendant killed Thompson and Robinson in cold blood, at

point-blank range, apparently over a fraudulent cocaine purchase, and that a week later he tried to kill Davis after he had shared beer and taken a car ride with him, the prosecutor's characterizations of defendant fell within the permissible bounds of argument.

Defendant also complains about the prosecutor's description of defendant as a "prowler" and a "denizen of the night" who was "in his element" at night, and the prosecutor's repeated references to defendant as a man of "concealed intent." Through these descriptions the prosecutor evidently was alluding to a March 1987 incident when the police saw defendant, who was loitering at night in a crime-ridden area, pull a gun from under his jacket and toss it away. Defendant did not object to the admission of evidence of this incident, and thus cannot complain about it now. In any event, the prosecutor's descriptions of defendant were permissible comments on the evidence. As for the later description of defendant as a man of "concealed intent," the prosecutor argued defendant intended to harm Thompson and Robinson as he stood outside Lisa McKaufman's house during the early morning hours of April 28, and that he had a similar intent toward Davis during the car trip on May 4, 1987. Again, based as they were on the evidence, these comments did not exceed the bounds of proper argument.

Defendant also contends the prosecutor improperly argued defendant was a habitual killer. Specifically, defendant cites as improper these descriptions of him: "a creator of victims . . . who turns people from life into death"; "the executioner"; "the terminator of precious life"; "a head hunter"; one who had no respect for the dead, the living, or anybody; and one who "kills or threatens, threatens or kills, whatever serves his purpose." Defendant further contends the prosecutor improperly argued: "This is a one-man crime wave. He may not be a serial killer, but killing is his byline. Two deaths and an attempt and an invitation and threats to back it up. A one-man gang, a worldly [*sic*] dervish of energy, poised and striped [*sic*] to kill. That's [defendant]." The challenged statements did not exceed the bounds of proper argument, given the evidence that defendant shot two people in the head at point-blank range over a purchase of fake cocaine.

Defendant argues that the prosecutor improperly urged the jury to convict him of murder based on an alleged predisposition to kill, based on these comments: "[Defendant] decides to execute in cold blood two helpless human beings that never ever saw this coming. Snatches with the left, shoots with the right, similar to the way he attacked Olin [Davis]. [¶] So, ladies and gentlemen, *he had a predisposition to kill and he acted it out.* And he got them to where he could mutilate them where nobody could see it and he did it . . . ." (Italics added.) The Attorney General counters that "predisposition to kill" was the prosecutor's shorthand way of saying that defendant intended to

kill Thompson and Robinson when Thompson could not get the money back for the fake rock of crack cocaine she had bought for defendant and Johnson. We need not decide what the prosecutor meant by his statement, for any misconduct was harmless. The statement was a tiny part of an otherwise permissible argument that spanned two days. That a more favorable verdict would have been received in the absence of the error is not reasonably probable, given the strong evidence that defendant shot Thompson and Robinson at point-blank range.

Defendant also cites as misconduct the prosecutor's assertion that defendant wanted to kill Olin Davis's brother Bruce at the same time he killed Olin: "And he wants to take Bruce along too so he can talk to Bruce. That's four. That's four. That's four. Another double homicide is contemplated on May 4th." Defendant objected to this comment, and the court sustained the objection, stating that the prosecutor was "in excess of the instruction on the purpose for which Mr. Davis' testimony was limited." The court told the prosecutor to "confine [his] remarks to the evidence as limited." The admonition cured any harm.

Defendant also contends the prosecutor engaged in misconduct by describing defendant as evil. The prosecutor argued: The case was about defendant's "utter evil"; dealing with defendant was like peeling the skin of an onion, with every layer being a "level of evil" and every layer peeled being "that much closer to the evil hard-core"; defendant was "the lowest common denominator and the complete and total essence of evil"; and "[t]he layers of evil within [defendant] surrounded a cold unyielding heart." None of these characterizations exceeded the permissible scope of closing argument.

### ii. *Biblical reference to evil*

Toward the end of his rebuttal argument at the guilt phase of trial, the prosecutor said he "had to look at something to make sense out of this, something to put this into some perspective because in 45 years [he had not] seen anything that [he could] compare . . . to" this case. He stated that although he was "not a religious person by any stretch of the imagination" he had read about the apocalypse as described in Revelation, the last book of the Bible. "[T]he word apocalypse," he said, put "defendant's conduct in proper perspective," except that in contrast to the apocalypse, defendant did not have "the necessary mandate" to carry out his actions. The prosecutor explained that in the apocalypse, a crowned rider on a white horse who came to conquer the world was followed by three other men on horses who came to kill and take peace away so that the world could start anew.

Describing the apocalypse as "the mandate of God," the prosecutor argued to the jury: "On what steed, with whose authority does [defendant] cut a path through the City of Oakland leaving murder and death and destruction and utter annihilation in his wake? By what authority is he guided? [¶] This man is the disciple of Satan, ladies and gentlemen. He has worked his way up into this community from the deep inner core of this planet like a sour foul putrid weed. He has cracked the soil and killed all before him so he can live, and when the sun goes down he comes out and he slaughters and he maims and he murders. [¶] But, . . . he's not the judge and jury in this case, you are, and that's where he comes up short. The man is the utter harbinger of senseless total annihilation, no more, no less. You must take the sword from him and cast it down and tell him that he was wrong and he may go no further." The prosecutor continued: "[T]he institutions that govern the conduct of the people in this world are to be taken most seriously. The Penal Code of this state consists of thousands of laws but they mean nothing until you give them life through your verdict and set the appropriate standard of conduct."

 We repeatedly have held that prosecutors may not appeal to religious authority in a closing argument to the jury. Our opinions have most often discussed such arguments when made at the *penalty phase* of a capital case, because the decision whether to impose the death penalty is an ethical and normative question that at first glance seems amenable to religious argument. As we have explained, such argument is improper, because to invoke God may diminish the jurors' sense of personal responsibility for the decision whether to impose the death penalty or may encourage jurors to base their penalty decision on a different or higher law than that found in the California Penal Code. (*People v. Ervin* (2000) 22 Cal.4th 48, 100 [91 Cal.Rptr.2d 623, 990 P.2d 506]; *People v. Welch* (1999) 20 Cal.4th 701, 761–762 [85 Cal.Rptr.2d 203, 976 P.2d 754]; *People v. Roybal* (1998) 19 Cal.4th 481, 519–521 [79 Cal.Rptr.2d 487, 966 P.2d 521]; *People v. Hill, supra,* 17 Cal.4th at pp. 836–837; *People v. Bradford* (1997) 14 Cal.4th 1005, 1063 [60 Cal.Rptr.2d 225, 929 P.2d 544]; *People v. Wash* (1993) 6 Cal.4th 215, 260–261 [24 Cal.Rptr.2d 421, 861 P.2d 1107]; *People v. Sandoval* (1992) 4 Cal.4th 155, 193–194 [14 Cal.Rptr.2d 342, 841 P.2d 862].)

 Here, the prosecutor's biblical reference came at the guilt, not the penalty, phase of trial. Appeals to religious authority at the guilt phase are also impermissible, but for a different reason than at the penalty phase. The jury at the guilt phase is not charged with making an ethical or normative decision; instead, it decides questions of historical fact based on the evidence and applies to those facts the law as articulated by the trial court. Religious input has no legitimate role to play in this process. (See generally *People v. Williams* (2001) 25 Cal.4th 441, 463 [106 Cal.Rptr.2d 295, 21 P.3d 1209].)

But not every reference to the Bible is an appeal to religious authority. Not only is the Bible a religious text, but it is also generally regarded as a literary masterpiece; indeed, it is among the oldest and best-known literary works in our culture. The English departments of major secular universities teach courses on the Bible as literature.[4] And this court has repeatedly held that in closing argument attorneys may use "illustrations drawn from common experience, history, or *literature*." (*People v. Love* (1961) 56 Cal.2d 720, 730 [16 Cal.Rptr. 777, 366 P.2d 33], italics added; see also *People v. Boyette* (2002) 29 Cal.4th 381, 463 [127 Cal.Rptr.2d 544, 58 P.3d 391]; *People v. Cunningham* (2001) 25 Cal.4th 926, 1026 [108 Cal.Rptr.2d 291, 25 P.3d 519]; *People v. Hill, supra,* 17 Cal.4th at p. 819; *People v. Williams* (1997) 16 Cal.4th 153, 221 [66 Cal.Rptr.2d 123, 940 P.2d 710]; *People v. Sandoval, supra,* 4 Cal.4th at p. 193; *People v. Wharton, supra,* 53 Cal.3d at p. 567; *People v. Farmer* (1989) 47 Cal.3d 888, 922 [254 Cal.Rptr. 508, 765 P.2d 940]; *People v. Thornton, supra,* 11 Cal.3d at p. 763.) As an article in a respected law journal explains, "fiction, anecdotes, jokes and *Bible stories* are commonly regarded as acceptable" in closing argument. (Levin & Levy, *Persuading the Jury with Facts Not in Evidence: The Fiction-Science Spectrum* (1956) 105 U.Pa. L.Rev. 139, 147, italics added.)

■ When references to the Bible are involved, the line between literary allusion and religious appeal is often a fine one. A prosecutor who mentions the Bible in closing argument runs a grave risk that a reviewing court will find that the line has been crossed and will reverse the defendant's conviction. Because any use of biblical references in argument must be carefully scrutinized, cautious prosecutors will choose to avoid such references. Nevertheless, so long as they do not appeal to religious authority, prosecutors may refer to the Bible in closing argument to illustrate a point.

Here, a reasonable juror likely would understand the prosecutor's biblical references merely as a powerfully dramatic illustration of the gravity and enormity of defendant's crimes. The prosecutor did not argue that biblical law or doctrine required defendant's conviction of the charges against him.[5] Indeed, he prefaced his remarks with a statement that he himself was "not a religious person." Because the prosecutor did not use the biblical allusion as an appeal to religious authority, we do not find prosecutorial misconduct in this case.

---

[4] English department courses on the Bible as literature appear in the on-line catalogues of Yale University and the University of California at Los Angeles.

[5] Justice Moreno's concurring opinion states that the prosecutor's biblical allusion "was an invitation to the jury to apply a 'higher law than that found in the California Penal Code.'" (Conc. opn., *post*, at p. 262.) To the contrary, the prosecutor concluded the allusion with these words: "The Penal Code of this state consists of thousands of laws but they mean nothing until you give them life through your verdict . . . ."

### iii. *Fabrication of evidence*

In his closing argument, the prosecutor said in reference to defendant's attempted murder of Davis: "[W]hen [defendant] gets out of that car, he comes around with the gun extended in his right hand up in the ready position, he opens the door, he looks at his friend [Davis] and he says, 'My friend, you are through, you're through. *I'm going to kill you. You're not going to live to testify against me in the superior court trial. You're going to die.'* That's exactly what his intention is." (Italics added.) Pointing out that Davis testified defendant said only "you're through" after opening the car door, defendant contends the prosecutor fabricated evidence.

"While counsel is accorded 'great latitude at argument to urge whatever conclusions counsel believes can properly be drawn from the evidence [citation],' counsel may not assume or state facts not in evidence [citation] or mischaracterize the evidence [citation]." (*People v. Valdez, supra,* 32 Cal.4th 73, 133–134.) "Whether the inferences the prosecutor draws are reasonable is for the jury to decide." (*People v. Dennis, supra,* 17 Cal.4th at p. 522.) Here, the prosecutor did not fabricate evidence. After making the argument in question, he immediately said, "That's exactly what [defendant's] intention is." The prosecutor thus merely suggested an inference that the jury could draw from Davis's testimony.

### 4. *Arguing the facts of the March 1987 incident*

During his closing argument, the prosecutor told the jury there was evidence defendant possessed a firearm in March 1987. But the prosecutor promptly told the jury defendant was not on trial for the March 1987 incident and that the jury could consider evidence of that incident only to show defendant had access to the kind of firearm used in the double murders.

Defendant contends that the trial court should not have admitted evidence of the March 1987 incident, and that the prosecutor engaged in misconduct during closing argument by relying on the incident to persuade the jury that defendant had a criminal disposition.

Evidence of the March 1987 incident was admitted without objection. Thus, the prosecutor was permitted to refer to such evidence. Contrary to defendant's argument, moreover, the prosecutor did not argue that he was a man of criminal disposition because he possessed a firearm in 1987. No misconduct occurred.

### G. *Instructional Errors*

#### 1. *Limiting instructions on uncharged offenses*

As stated, before Olin Davis testified about the attempt to kill him, the trial court instructed the jury:

"Mr. Davis is about to testify to a series of events that took place on May 4th, 1987, which involve interaction between Mr. Davis, [defendant], and Mr. Ronald Gino Harrison. And the evidence . . . will reveal the commission of a crime against [Davis], namely an assault with a deadly weapon at the very least. What I want to have you understand is this.

"[Defendant] is not charged with this crime in this case, and you are not to consider this evidence for determining his guilt for this crime that he's not charged with, or to hear it to come to some conclusion that he's a bad person because of what happened here.

"This evidence is being admitted to explain—to evaluate—to assist you in evaluating the testimony of Mr. Olin Davis and to flesh out, if you will, the relationship between Mr. Davis and [defendant], and it may become relevant for purposes for which you will be specifically instructed otherwise.

"But I want to make sure you understand it's evidence of an uncharged crime, and it's being heard here for very limited purposes. And you must not—it is not direct evidence on the issues that you're here to ask about the two counts of murder, but it relates to Mr. Davis' credibility and believability as you should evaluate that, the motives that he may have for testifying here in relationship to [defendant], and other factors which may become apparent upon which you will be specifically instructed."

At a sidebar conference immediately thereafter, the prosecutor asked to have the instruction read back during the break because he was concerned the court had instructed the jury it was not to consider this evidence "in any form" as to defendant's guilt. The court denied having done so, but the prosecutor nevertheless asked to read the transcript of the instruction to make sure.

The trial court then told the jury: "As is frequently the possibility when we speak extemporaneously, I may have misspoken. I'm going to have this transcript reread to me. I want to make sure all I'm telling you here is that this testimony that you're about to hear is special testimony, and it will be heard by you for limited reasons which will be fully explained at the conclusion of the trial. And I want you to understand that and to keep it

separate from the testimony of Mr. Davis on, for instance, attributed to him, that he attributes certain statements to [defendant] directly relevant to the two counts, and we'll leave it at that. [¶] If I've misspoken myself, I'll correct it when I've reread the transcript. All of this will be cleared up at the end of trial, I hope."

The prosecutor read the relevant portion of the reporter's transcript during a break. Thereafter, he said he had no objections to the wording of the court's instructions to the jury.

At the close of the guilt phase, the trial court gave the standard jury instruction on evidence limited as to purpose (CALJIC No. 2.09 (5th ed. 1988))[6] and a modified jury instruction on "other crimes" evidence (CALJIC No. 2.50 (5th ed. 1988)).[7] Defendant challenges these instructions on several grounds.

First, defendant contends the trial court's limiting instruction to the jury during Davis's testimony was erroneous because evidence of defendant's attempt to kill Davis should not have been admitted at all. As discussed in part III.A, *ante*, the court properly admitted that evidence. Accordingly, we reject the argument that the limiting instruction on this issue was erroneous on this basis.

Next, defendant complains this instruction must have confused the jury because the trial court told the jury it might have "misspoken" in instructing the jury, without identifying the portion of the instruction at issue. Thus, defendant argues, the jury was left without guidance as to how to consider the evidence of defendant's attempted murder of Davis. Not so. The court expressly instructed the jury that it could consider such evidence for limited

---

[6] The trial court instructed the jury under CALJIC No. 2.09: "Certain evidence was admitted during the trial . . . for a limited purpose. At the time this evidence was admitted, you were admonished that it could not be considered by you for any purpose other than the limited purpose for which it was admitted. Do not consider such evidence for any purpose except the limited purpose for which it was admitted."

[7] The court instructed the jury:

"Evidence has been introduced for the purpose of showing that the defendant committed crimes other than that for which he is on trial. Such evidence, if believed, was not received and may not be considered by you to prove that the defendant is a person of bad character or that he has a disposition to commit crimes.

"Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show the defendant had knowledge or possessed the means that might have been useful or necessary for the commission of the crimes charged, the defendant had a consciousness of guilt with respect to the crimes charged.

"For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case. You are not permitted to consider such evidence for any other purpose."

purposes, such as credibility, believability, and motive, and that, if other purposes later became relevant, the jury would be instructed accordingly. In any event, any possible jury confusion engendered by the trial court's statement that it might have "misspoken" was cleared up at the end of trial when the court gave a modified version of CALJIC No. 2.50, which identified the particular limited purposes for which the jury could consider other crimes evidence. There is no reasonable likelihood the jury was confused and misconstrued or misapplied the instruction (see *People v. Clair, supra,* 2 Cal.4th at pp. 662–663), and defendant's argument to the contrary is speculation.

Defendant also contends the trial court erred in giving a modified version of CALJIC No. 2.50, because it was unnecessary and irrelevant. He argues that instructing the jury that "other crimes" evidence may be considered "for the limited purpose of determining if it tends to show the defendant had knowledge or possessed the means that might have been useful or necessary for the commission of the crimes charged" was unnecessary because at trial defendant did not deny that he had access to guns. He also argues that instructing the jury that other crimes evidence may be considered "for the limited purpose of determining if it tends to show [that] . . . the defendant had a consciousness of guilt with respect to the crimes charged" was erroneous because the March 1987 incident was irrelevant on this issue.

■■■ We find no error. "[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." (*People v. Burgener* (1986) 41 Cal.3d 505, 538 [224 Cal.Rptr. 112, 714 P.2d 1251].) In addition to the above instructions, the trial court instructed the jury: "Whether some instructions apply will depend upon what you find to be the facts. Disregard any instruction which applies to facts determined by you not to exist." (See CALJIC No. 17.31 (5th ed. 1988).) Viewed as a whole, the instructions adequately advised the jury how to consider evidence limited as to purpose and other crimes evidence.

Finally, defendant contends the trial court's guilt phase instructions were inadequate to "overcome" the voluminous evidence admitted on attempted murder and the prosecutor's improper closing argument that defendant's character, as shown by other crimes evidence, proved he committed the double murders. Defendant's contention essentially repeats earlier claims of erroneous admission of evidence and prosecutorial misconduct, which we have already rejected.

### 2. *Defense special instructions*

#### a. *Special instruction C*

At the time of trial, Bruce Davis, a prosecution witness and the brother of Olin Davis, was in jail facing six counts of robbery.

Robert Williams, another prosecution witness, testified at trial that he had been originally charged with four felony counts stemming from his May 4, 1987, altercation with Olin Davis, but the day after he testified at defendant's preliminary hearing three of these counts were dismissed. Williams pleaded guilty to one count of assault with a deadly weapon and, in 1989, was sentenced to 18 years in state prison. He was serving his sentence at the time of trial.

Defendant requested, but the trial court refused, this special instruction (special instruction C): "The testimony of a witness who provides evidence against a defendant in the hope or expectation of leniency in his punishment must be examined and weighed by the jury with greater care than would be applied to the testimony of an ordinary witness. [¶] The jury should examine such testimony to determine whether it is colored in such a way as to place guilt on the defendant in order to further the witness' own interest, for such a witness, confronted with the realization that he can secure leniency or freedom by incriminating another has a motive to falsify." In requesting this special instruction, defense counsel explained it focused on the expectation of leniency by Bruce Davis and Robert Williams and the effect of such expectation on their testimony. In refusing the instruction, the court noted that the requested instruction was "overspecialized," and that CALJIC No. 2.20 adequately focused the jury's attention on the existence or nonexistence of bias, interest, or other motive of a witness. Defendant contends the court erred in so ruling, and thereby violated his right to a fair trial.

■ "We have suggested that 'in appropriate circumstances' a trial court may be required to give a requested jury instruction that pinpoints a defense theory of the case . . . ." (*People v. Bolden, supra,* 29 Cal.4th at p. 558.) But a court need not give a pinpoint instruction if it "merely duplicates other instructions." (*Ibid.*; see also, e.g., *People v. Garceau* (1993) 6 Cal.4th 140, 191 [24 Cal.Rptr.2d 664, 862 P.2d 664] [no error in refusing to give a special instruction that would have cautioned the jury to examine with greater care the testimony of an informer, for the jury received adequate standard instructions on the credibility of witnesses].)

Here, the jury received instructions on the credibility of witnesses in general (CALJIC No. 2.20) and on the credibility of a witness who has been

convicted of a felony (CALJIC No. 2.23). Together, these instructions adequately informed the jury that the "existence or nonexistence of a bias, interest, or other motive" and a witness's prior conviction of a felony were factors it could consider in determining the believability of a witness. Defendant cites no authority to support his argument that these instructions were inadequate, and we find none. Accordingly, the court did not err in refusing to give defendant's special instruction C. Thus, defendant's right to a fair trial was not violated.

### b. *Special instruction D*

Defendant also requested, but the trial court refused, this special instruction (special instruction D): "If a party has it peculiarly within his power to produce a witness whose testimony would be material on any matter in issue, the fact that he does not creates the presumption that the testimony, if produced, would be unfavorable to that party." In requesting this instruction, defense counsel noted that the prosecution had the power to produce Richard Johnson and Olin Davis's roommate "Moe" but did not do so, and claimed that their testimony would have been material to the murders themselves and to defendant's admission to the murders. In refusing the instruction, the trial court noted it was not satisfied that the requested instruction correctly stated the law. Defendant contends the court's refusal to give this instruction violated his right to a fair trial.

Defendant argues that special instruction D "reflects the provisions of Evidence Code section 412." That section provides: "If weaker and less satisfactory evidence is offered when it was within the power of the party to produce stronger and more satisfactory evidence, the evidence offered should be viewed with distrust."

We need not decide whether special instruction D is consistent with Evidence Code section 412, for instruction on this issue was inapplicable in any event. It was undisputed at trial that the prosecution tried to locate Johnson for trial but could not do so. As for the purported application of the requested instruction to "Moe," from the record it appears that no one had any information about him beyond his first name. Thus, the prosecution did not have enough information about Moe to produce him as a witness. Further, there was no evidence that Moe was present at the scene of the murders or when defendant made his admission to Davis. Davis testified that Moe was in the room when defendant came to his house a day or two after the murders, but that Davis and defendant walked out to the porch before defendant admitted to Davis that he killed Thompson and Robinson. Davis also testified that Moe was present when defendant returned to the house the next day with the newspaper clipping of the double murders, but that he was not present

when defendant and Davis further discussed the murders. Therefore, even if the prosecution could have found Moe, his testimony would not have been material. Accordingly, the court did not err, under state or federal law, in refusing to give special instruction D.

### H. *Cumulative Error*

Defendant contends the cumulative effect of the trial court's alleged errors and prosecutorial misconduct during the guilt phase resulted in an unfair trial, an unreliable verdict, and a miscarriage of justice under the state and federal Constitutions. For the sake of argument, we have assumed that the trial court erred by admitting Richard Johnson's out-of-court statement to Olin Davis (although defendant invited any error), and we have assumed that several of the prosecutor's comments in closing argument amounted to misconduct, although defendant forfeited the latter claims by failing to object or to request a curative admonition. In each of these instances, we have found the error harmless. The combined effect of these assumed errors did not deny defendant a fair trial, a reliable verdict, or any other constitutional right.

### IV. ISSUES RELATED TO THE PENALTY RETRIAL

### A. *Lingering Doubt Instruction*

The trial court instructed the jury: "Each individual juror may consider, as a mitigating circumstance, any residual or lingering doubt in the mind of that juror, as to whether the defendant murdered Leroy Robinson and Betty Thompson. You may not relitigate or reconsider matters which were resolved in the guilt phase, but you may consider such residual or lingering doubt, if it exists in your mind, as a circumstance in mitigation. [¶] . . . [¶] A lingering or residual doubt is defined as that state of mind between beyond a reasonable doubt and beyond all possible doubt." Defendant argues that the portion of this instruction prohibiting the jury from relitigating or reconsidering "matters" resolved in the guilt phase conflicted with the portion permitting it to consider lingering doubt as a circumstance in mitigation, thereby violating his rights under the Sixth and Fourteenth Amendments to the federal Constitution.

In resolving the issue of penalty, a capital jury may consider lingering doubts about a defendant's guilt. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1272 [74 Cal.Rptr.2d 212, 954 P.2d 475].) A trial court is not required as a matter of state or federal law, however, to instruct a penalty jury to consider lingering doubt as a factor in mitigation. (See *Franklin v. Lynaugh* (1988) 487 U.S. 164, 173–174 [101 L.Ed.2d 155, 108 S.Ct. 2320]; see also *People v. Valdez, supra,* 32 Cal.4th at p. 129, fn. 28; *People v. Musselwhite, supra,* 17 Cal.4th at p. 1272.)

■ Defendant argues that to properly consider lingering doubt, the penalty phase jury must, by definition, "reconsider matters which were resolved in the guilt phase," that is, whether defendant had committed the murders, and that the court erred in instructing otherwise. We disagree. The guilt phase jury determined defendant's guilt and the truth of the special circumstance allegation beyond a reasonable doubt. As a matter of law, the penalty phase jury must conclusively accept these findings. (See *People v. Cain* (1995) 10 Cal.4th 1, 66 [40 Cal.Rptr.2d 481, 892 P.2d 1224]; *People v. DeSantis* (1992) 2 Cal.4th 1198, 1238 [9 Cal.Rptr.2d 628, 831 P.2d 1210].)

Defendant criticizes as vague the trial court's definition of lingering doubt as "a state of mind between beyond a reasonable doubt and beyond all possible doubt." We have in the past upheld the adequacy of an identically worded instruction on lingering doubt. (*People v. Snow* (2003) 30 Cal.4th 43, 125 [132 Cal.Rptr.2d 271, 65 P.3d 749].) Defendant notes that, during voir dire of prospective jurors at the penalty phase retrial, several of those jurors, including one who was selected as a juror for the retrial, were confused on the concept of lingering doubt. But any confusion by prospective jurors who ultimately were not seated as jurors could not possibly have affected the penalty phase retrial. As for the one sitting juror who purportedly was confused on the concept of lingering doubt during voir dire, even assuming she was confused, we find no prejudice to defendant. The jury instructions at the end of the penalty phase retrial included an instruction on the definition of lingering doubt, and defendant does not argue that after hearing this instruction the juror in question or any other juror was confused about the concept of lingering doubt.

The instruction at issue, moreover, did not purport to limit the *evidence* the jury could consider on the issue of lingering doubt. Indeed, in closing argument defense counsel asked the jury to "objectively evaluate the evidence . . . [before] deciding whether or not there is a lingering doubt." We conclude that the instruction given "adequately convey[ed] the concept of lingering doubt and its proper relevance to the penalty decision." (*People v. Snow, supra*, 30 Cal.4th at p. 125.)

### B. *Prosecutorial Misconduct During Argument*

Citing five areas of alleged misconduct by the prosecutor during his penalty phase retrial closing argument, defendant contends the cumulative impact deprived him of a fair penalty phase trial. We disagree.

In part III.F of the discussion, *ante*, we set forth the constitutional standards governing prosecutorial misconduct. (See also *People v. Crew, supra*, 31 Cal.4th at p. 855.) Here, as we explain below, defendant fails to

show that the prosecutor's conduct infected the trial with such unfairness as to make the conviction a denial of due process, or that, in violation of state law, the prosecutor used deceptive or reprehensible methods to persuade the jury. Nor has defendant shown "a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Morales, supra,* 25 Cal.4th at p. 44.)

### 1. *Alleged Griffin error*

During his closing argument, the prosecutor urged the jury to reject any argument by the defense that the jury should have "compassion and sympathy" for defendant, contending that defendant's conduct demonstrated "a sense of very strong arrogance." Asserting that defendant acted as the judge, jury, and executioner of Thompson and Robinson, and that he tried to do the same to Olin Davis, the prosecutor said: "When he makes up his mind that a person must go, that person is through, 'you're through Olin and that's all there is to it.' But I'll tell you, ladies and gentlemen, he had no right to do it. *This is a man who should be on his knees apologizing for what he did to his poor victims.*" (Italics added.) When defendant objected, the trial court reminded the jury that the prosecutor's statements were not evidence and advised him to "move forward into another area." Defendant later unsuccessfully moved for a mistrial, claiming the prosecutor's statement that defendant should be on his knees apologizing was the functional equivalent of a comment on his failure to testify, in violation of *Griffin v. California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229].

"Pursuant to *Griffin,* it is error for a prosecutor to state that certain evidence is uncontradicted or unrefuted when that evidence could not be contradicted or refuted by anyone other than the defendant testifying on his or her own behalf." (*People v. Hughes* (2002) 27 Cal.4th 287, 371 [116 Cal.Rptr.2d 401, 39 P.3d 432].) We also have said "it is error for the prosecution to refer to the absence of evidence that only the defendant's testimony could provide." (*Id.* at p. 372, citing *People v. Murtishaw* (1981) 29 Cal.3d 733, 757 & fn. 19 [175 Cal.Rptr. 738, 631 P.2d 446].) *Griffin's* prohibition against " 'direct or indirect comment upon the failure of the defendant to take the witness stand,' " however, " 'does not extend to comments on the state of the evidence or on the failure of the defense to introduce material evidence or to call logical witnesses.' " (*People v. Hovey* (1988) 44 Cal.3d 543, 572 [244 Cal.Rptr. 121, 749 P.2d 776], quoting *People v. Jackson* (1980) 28 Cal.3d 264, 304 [168 Cal.Rptr. 603, 618 P.2d 149].)

Here, the prosecutor's remark that defendant "should be on his knees apologizing" was not a reference to defendant's failure to testify, but rather

an assertion that defendant was proud of the murders when he ought to be ashamed of them. The prosecutor's argument to the jury after defense counsel's objection demonstrates his purpose in making the remark: He pointed out that defendant had bragged about the murders to Olin Davis, and he argued that defendant cut out a newspaper clipping that mentioned the murders because he was "proud as a peacock" that he had committed them. This argument did not violate *Griffin v. California, supra,* 380 U.S. 609. (See *People v. Boyette, supra,* 29 Cal.4th at p. 455; *People v. Crittenden* (1994) 9 Cal.4th 83, 147 [36 Cal.Rptr.2d 474, 885 P.2d 887].)

### 2. *Reference to inapplicable law*

During closing argument, the prosecutor discussed the events leading to defendant's attempted murder of Davis and argued that defendant intended to kill Davis to eliminate him as a witness. The prosecutor continued: "Ladies and gentlemen, *the murder of a witness in the State of California is a special circumstance, itself, in and of itself makes someone eligible for the death penalty, in addition to the multiple murder special circumstance.* He was going to kill a witness to a crime within a week of executing two people." (Italics added.) Defendant objected to the italicized portion of the argument, and the trial court sustained the objection. The court told the jury that the special circumstance the prosecutor referred to "was not and is not alleged in this case" and that the jury should disregard it.

Defendant contends the italicized statement provided the jury with a "perfect independent rationale for a verdict of death." We disagree. In the context of the prosecutor's discussion of defendant's attempted murder of Davis, the statement was merely an attempt to convey to the jury the seriousness of the crime against Davis. In any event, there is no reasonable likelihood the jury construed or applied the challenged remark in an objectionable fashion, given that defendant did not kill Davis, the prosecutor did not argue defendant killed Davis, and the jury was told that the special circumstance of murdering a witness was not alleged in this case and that it should disregard the remark.

### 3. *Epithets*

■ Near the beginning of his closing argument at the penalty phase, the prosecutor commented: "When we picked the jury and we went through that process, . . . I looked at this case and I said I can hardly wait to get up to argument and tell this jury what a rotten, nasty, S.O.B. and M.F. this man is." Later, the prosecutor also referred to defendant as a "punk[]." The trial court noted defense counsel's objection to "name calling" and admonished the jury that the statements of counsel were not evidence. Defendant asserts that both

comments were improper. Although "epithets are not necessarily misconduct when they are reasonably warranted by the evidence" (*People v. McDermott* (2002) 28 Cal.4th 946, 1002 [123 Cal.Rptr.2d 654, 51 P.3d 874]), we do not condone the use of profanity in arguments to the jury. Here, however, defendant did not object to the initial remark or request an admonition, so he cannot challenge it on appeal. (*Id.* at p. 1003.) In any event, these brief references "would not have had such an impact 'as to make it likely the jury's decision was rooted in passion rather than evidence.' [Citation.]" (*Ibid.*)

### 4. *Facts not in evidence*

In his closing argument, the prosecutor said: "I believe that if you embrace a man and hold him, you can feel him . . . . And then when you hold that man and shoot that man, you can feel that man die. You can feel his life pass from his spirit through your body and gone to the beyond and it's that singular feeling of being close and being near to sense and feel and smell the fear . . . that gives life to [defendant] needing to feel that life forcing through him and pass on and then drop the carcass to the ground. Death is invigorating to him . . . . That's why he shoots these people in the head." Defendant argues there was no evidence to support this "ghoulish depiction." Because he did not object to the remarks or request an admonition at trial, he may not now challenge them. Moreover, the remarks were reasonable commentary on the evidence that defendant was holding Robinson when he fatally shot him in the head and that he was holding Olin Davis when he tried to kill him by shooting him in the head. In any event, these brief comments in a very long closing argument were harmless under any standard.

Defendant also complains about the prosecutor's comment in closing argument that defendant was "sponging off his mom." Defendant objected that there was no such evidence, whereupon the trial court reminded the jury that the statements of counsel were not evidence in the case. Even assuming the remark was improper, there is no reasonable likelihood that the jury applied it in an objectionable fashion.

### 5. *Davenport error*

During his discussion of section 190.3, factor (k) ("Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime"), the prosecutor stated: "[N]obody came up here from [defendant's] family. I haven't seen any employers. I haven't seen any school teachers. I haven't seen anybody from the college . . . . I haven't seen anyone come into this courtroom and say anything on his behalf, nothing whatsoever, and if it existed, I guess he would be here by now. [¶] [This instruction] is the

vehicle . . . upon which you most reasonably would base a verdict of life. And all of this, all of this that's available to him, all of that which the law requires, all of that gives him a possible basis for life, he can answer none of this . . . . This instruction is useless to him because he can't fill any of the blanks."

Defendant contends the prosecutor improperly argued to the jury that the absence of mitigating factors was evidence in aggravation, in violation of *People v. Davenport* (1985) 41 Cal.3d 247, 288–290 [221 Cal.Rptr. 794, 710 P.2d 861]. Defendant forfeited this argument by failing to object. (See *People v. Gurule* (2002) 28 Cal.4th 557, 657–658 [123 Cal.Rptr.2d 345, 51 P.3d 224].)

In any event, the point lacks merit. Although the prosecutor noted the absence of evidence of mitigation, he did not argue that this absence "transformed the mitigating factors into aggravating factors." (*People v. McDermott, supra,* 28 Cal.4th at p. 1003.) His statements fell within the range of proper prosecutorial argument. (See *id.* at pp. 1003–1004; see also *People v. Clark* (1993) 5 Cal.4th 950, 1030 [22 Cal.Rptr.2d 689, 857 P.2d 1099].)

 6. *Cumulative effect of asserted instances of prosecutorial misconduct*

There is no merit to the claims of prosecutorial misconduct, and thus there is no improper cumulative effect.

 C. *Constitutionality of California's Death Penalty Statute*

Defendant challenges various aspects of California's death penalty law as violating the federal Constitution. We have previously rejected these challenges, and we decline to reconsider them here. A summary of the pertinent holdings follows.

■ The special circumstances listed in section 190.2 adequately narrow the class of murder for which the death penalty may be imposed. (*People v. Crew, supra,* 31 Cal.4th at p. 860; *People v. Burgener* (2003) 29 Cal.4th 833, 884 & fn. 7 [129 Cal.Rptr.2d 747, 62 P.3d 1]; *People v. Bolden, supra,* 29 Cal.4th at p. 566.) Section 190.3, factor (a), which permits the jury to consider the circumstances of the capital crime as an aggravating factor, is not unconstitutionally vague. (*Tuilaepa v. California* (1994) 512 U.S. 967, 973 [129 L.Ed.2d 750, 114 S.Ct. 2630]; *People v. Bolden, supra,* at p. 566; *People v. Mendoza* (2000) 24 Cal.4th 130, 192 [99 Cal.Rptr.2d 485, 6 P.3d 150].) Identification of sentencing factors as aggravating or mitigating is not

constitutionally required. (*People v. Crew*, *supra*, at p. 860.) "The prosecution need not prove beyond a reasonable doubt that aggravating factors outweigh mitigating factors, and the jury need not find beyond a reasonable doubt that death is the appropriate punishment." (*Ibid.*) The jury need not be instructed on the burden of proof on the issue of penalty. (*People v. Mendoza*, *supra*, at p. 191.) Written jury findings or unanimity as to aggravating circumstances are not constitutionally required. (*People v. Crew*, *supra*, at p. 860; *People v. Bolden*, *supra*, at p. 566.) Intercase proportionality review is not required. (*Ibid.*)

## V. DISPOSITION

We affirm the judgment in its entirety.

George, C. J., Baxter, J., Chin, J., and Brown, J., concurred.

**MORENO, J.**—I concur with the result and the reasoning of the majority, except insofar as it concludes that the religious references made by the prosecutor at the guilt phase of the trial were not misconduct. I would conclude that the prosecutor's invocation of religion during defendant's guilt phase trial constituted misconduct, but was not prejudicial, given the strong evidence of defendant's guilt.

As the majority rightfully acknowledges, we have repeatedly held that a prosecutor may not appeal to religious authority in a closing argument to the jury. (Maj. opn., *ante*, at p. 247.) I agree with the majority that "[w]hen references to the Bible are involved, the line between literary allusion and religious appeal is often a fine one." (*Id.*, at p. 248.) I believe that the prosecutorial argument at issue here, however, falls squarely on the wrong side of that line.

The majority opinion quotes at length the pertinent portion of the prosecutor's argument invoking the Bible, and I therefore need not quote it in full here. (See maj. opn., *ante*, at pp. 246–247.) Of particular significance are the prosecutor's extended metaphor invoking the Four Horsemen of the Apocalypse (see Revelation 6:1–6:8), his description of defendant as "the disciple of Satan," and his charge to the jury to "take the sword from [defendant] and cast it down and tell him that he was wrong and may go no further." (Maj. opn., *ante*, at p. 247.)

The majority is correct to note that "not every reference to the Bible is an appeal to religious authority." (Maj. opn., *ante*, at p. 248.) Literary allusion, which is by definition "a covert, implied, or indirect reference" to a work of

literature (1 Oxford English Dict. (2d ed. 1989) p. 349), is permissible in closing argument even when the work of literature alluded to is the Bible. Indeed, counsel would be well within the bounds of permissible argument if he or she referred to a skeptical expert witness as a "doubting Thomas" (John 20:24–20:28), or called someone a "good Samaritan." (Luke 10:33–10:34.)

However, extended references to biblical passages that explicitly relate principles or illustrations from the Bible to the case at hand go well beyond mere allusion. While it is true that the Bible is "generally regarded as a literary masterpiece" (maj. opn., *ante*, at p. 248), it is clearly more than a work of literature to many potential jurors who may believe the Bible to be divinely inspired. As such, any extended reference to the Bible can be expected to carry an inherent authority behind it that illustrations drawn from Dickens, Shakespeare, or J.K. Rowling could not. To pretend otherwise would be to ignore the reality that, to many people, the Bible is not just a literary work but a holy text.

Although the majority correctly notes that "any use of biblical references in argument *must* be carefully scrutinized" (maj. opn., *ante*, at p. 248, italics added), it then concludes that "a reasonable juror likely would understand the prosecutor's biblical references merely as a powerfully dramatic illustration of the gravity and enormity of defendant's crimes." I am unpersuaded.

An argument need not directly tell jurors to supplant the state's law with God's law to invoke religious authority. The prosecutorial argument at issue here was not only biblical in style and substance, but made an explicit and extended comparison between defendant and the Four Horsemen and called defendant a "disciple of Satan." Indeed, the aim of the prosecutor's extended, albeit somewhat confusing, comparison between defendant and the Horsemen appears to be that defendant, unlike the Horsemen, lacked "the necessary mandate" to kill. In contrast, though the prosecutor did not directly urge the jury to follow religious law rather than California law, he did suggest that, unlike defendant, the jury had a divine mandate, if not a religious obligation, to "cast . . . down" defendant and to judge him guilty. In addition, using language strongly evocative of biblical passages, the prosecutor charged the jury with a mandate to "take the sword from [defendant] and cast it down and tell him that he was wrong and he may go no further." This extended metaphor was an invitation to the jury to apply a "higher law than that found in the California Penal Code." (Maj. opn., *ante*, at p. 247.)

Because I believe that the prosecutor's closing argument at the guilt phase crossed the line between permissible allusion to the Bible and impermissible religious exhortation, I would conclude that the argument was improper.

Werdegar, J., concurred.

Appellant's petition for a rehearing was denied May 18, 2005.