Filed 1/8/15  P. v. Hupp CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>PAUL HUPP,<br><br>    Defendant and Appellant. | D064053<br><br><br>(Super. Ct. No. SCD238651) |

APPEAL from a judgment of the Superior Court of San Diego County, Margaret A. Powers, Judge.  (Retired Judge of the San Bernardino Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed as modified.

Robert Booher, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood, Marilyn George, and Meagan J. Beale, Deputy Attorneys General, for Plaintiff and Respondent.

Paul Hupp appeals from a judgment convicting him of stalking, stalking in violation of a court order, and other offenses based on his conduct of sending numerous threatening-type letters to a pro tem administrative law judge who had issued a decision unfavorable to him. Defendant argues the judgment must be reversed because his counsel provided ineffective representation by failing to move to exclude evidence of a contempt conviction incurred by defendant when he violated a restraining order obtained by the victim. Defendant also contends he was deprived of a fair trial because the prosecutor was allowed to present to the jury collateral, irrelevant, and prejudicial matters, including during a lengthy cross-examination of defendant and in closing arguments. We reject these contentions.

Finally, defendant argues he cannot properly be convicted of both simple stalking (count 1) and stalking in violation of a court order (count 2). Under the circumstances of this case we agree. We modify the judgment to vacate the count 1 simple stalking conviction.

FACTUAL AND PROCEDURAL BACKGROUND

*Letters Sent by Defendant in 2000 and 2006*

*Concerning Freedman's 1998 Administrative Decision*

In June 1998, victim Jeffrey Freedman, sitting as a pro tem administrative law judge (ALJ), presided over an administrative hearing to adjudicate an appeal filed by defendant to challenge a decision by the California Commission on Teacher Credentialing (Commission) denying defendant's application to obtain an emergency permit to be a substitute teacher. Freedman submitted a written proposed decision

2

unfavorable to defendant, which was adopted by the Commission. Defendant filed a petition for writ of mandate in superior court, and in September 1999 the trial judge ruled in defendant's favor, finding that the Commission's findings did not support that defendant was unfit to teach and ordering the Commission to grant his application for a teaching permit.[1]

Notwithstanding his ultimate success in the mandamus proceedings, defendant was extremely upset by Freedman's 1998 decision. In February 2000 and June 2006, defendant sent letters to Freedman at his home address expressing his sentiments in a derogatory and expletive-laden style. The February 2000 correspondence was in an envelope addressed to "Jeffery 'Dickhead' Freedman"; it included a handwritten note stating "Pull your head out of your ass!"; and it enclosed a copy of the 1999 mandamus order overturning the Commission's denial of defendant's teaching permit application.

---

[1] The basis for the Commission's denial of defendant's teaching permit application arose from defendant's 1982 misdemeanor conviction for contributing to the delinquency of a minor. Defendant (then age 21) pled no contest to this offense based on an incident in which he and another 21-year-old male were in a car drinking beer with two girls ages 14 and 15. In 1987, defendant applied for a certificate of clearance from the Commission to allow him to obtain a teaching credential. Defendant failed to disclose his 1982 conviction in this application, and due to this nondisclosure and an assessment that his offense involved moral turpitude, the Commission declined to issue the certificate of clearance. In 1997, defendant obtained an expungement of his 1982 conviction. That same year, defendant submitted an application for an emergency substitute teaching permit; the Commission's executive director denied his application for the same reasons used to deny him the certificate of clearance in 1987; and defendant requested an administrative hearing to review the executive director's denial. After hearing the evidence presented at the administrative hearing, Freedman concluded denial of a substitute teaching permit was warranted because defendant's 1982 conviction involved acts of moral turpitude and directly related to his fitness to teach, and defendant failed to disclose this conviction in his 1987 application for a certificate of clearance.

The June 2006 correspondence consisted of a lengthy typewritten letter which was addressed to "Bozo Freedman" and which contained numerous attacks on the 1998 decision and Freedman himself, stating such things as the decision was "one of the worst administrative law decisions in California history"; it was either a "set up" or Freedman was a "stupid motherfucker"; Freedman was a "cock sucking liar" and "cock sucking piece of shit"; Freedman misrepresented and made up evidence; based on the "lies and damage" Freedman had caused it was a miracle that "nothing has happened" to him; Freedman "better learn to treat people in a fair and decent manner—do you understand me bitch?"; and Freedman had "a beautiful home." Defendant included a copy of the 1998 administrative decision with handwritten comments referring to portions of the opinion and containing numerous additional derogatory statements and obscenities.[2]

Freedman testified that about four months before he received the June 2006 correspondence, he began receiving obscene phone calls at home from a caller who said Freedman's name and then used "a stream of obscenities" that matched the obscenities used in the June 2006 letter, stating for example, " 'Hey motherfucking cocksucker. Hey, Jeff, you are a fucking cocksucker."

After receiving the June 2006 letter, Freedman applied for a restraining order prohibiting defendant from contacting him. In his written opposition to the restraining

---

[2]     Defendant's handwritten annotations on the administrative opinion stated such things as "piece of bullshit"; "you mother fucking liar"; "more bullshit"; "piece of shit liar"; "<u>wrong</u> code section Einstein"; "total bull shit"; "petty crime asshole"; "hey dickhead—did they teach you the 1st am. in law school?"; "total bullshit pulled out of your ass"; "you fucking retard"; "ass clown"; "<u>one</u> thing your pea brain got right"; and "Hey Jeff Go <u>Fuck</u>! Yourself! You cock sucking loser!"

order application, defendant asserted that his letter was constitutionally protected free speech and it contained no threats, and repeatedly accused Freedman of fabricating information in the restraining order request and in his 1998 administration decision.[3] After holding a hearing, the court granted a three-year restraining order, which expired on July 7, 2009.

*Anonymous Letters Sent to Freedman in 2009 and 2010,*

*and 2010 Restraining Order Against Defendant*

Shortly after the expiration of the three-year restraining order issued in 2006, Freedman again started receiving letters, but this time they were anonymous. These anonymous letters form the basis for the stalking and other charges brought in the criminal proceeding at issue in this appeal.

The first anonymous letter, sent in September 2009 to both Freedman's home and office, consisted of a short typed note stating, "Hey you little cock sucking mother fucker-have you lied under oath recently you little fucking bitch? . . . [¶] Why don't you do the world a favor and get cancer and DIE. [¶] Because the world will be a much better place without a perjuring piece of shit like you in it." Freedman testified he was certain the letter was from defendant, explaining the language was similar to the 2006 letter from defendant; Freedman had testified at the hearing on his 2006 restraining order

---

3    For example, defendant's opposition stated that Freedman "made numerous false statements and fabricated false evidence" in his 1998 administrative decision; Freedman's "fabrication of false evidence is well documented by the reversal of his administrative decision"; Freedman's claims in the restraining order application contain "false fabrication[s]"; Freedman "has a history of making false accusations [and] fabricating evidence"; and Freedman "tries to manipulate evidence."

application; no one else had ever accused him of lying under oath; and he had "no feuds, no vendettas, no arguments with anybody on earth other than the letter that [he] got from [defendant] in 2006."

In March and September 2010, Freedman received additional anonymous typed letters at his home and office, which used similar language to call Freedman obscene names and accuse him of perjury.[4] Freedman obtained a temporary restraining order (TRO) in March, but it was dissolved after multiple unsuccessful attempts to serve defendant. After receiving the September 2010 letter, Freedman sought legal assistance from the office of administrative hearings, which arranged for the Attorney General's office to assist him. Represented by a deputy attorney general, on October 14, 2010, Freedman obtained another TRO, with a hearing set for November 15, 2010. The TRO was served on defendant on October 27, 2010. Two days later, on October 29, another anonymous typed letter was sent to Freedman's home and office, stating, "What did I tell you fuck head, your perjuring days are over. [Freedman's home address]."

In a written response to Freedman's 2010 restraining order application, defendant claimed Freedman was attempting to "frame" him by making "false and unsupported accusations," which was Freedman's "pattern and practice" as shown by his "false and

---

4    The March 2010 letter stated:  "Your PERJURYING days are OVER you little cock sucking piece of shit.  [¶]  You can run but you can't hide  [¶]  Remember that you little bitch  [¶]  . . . [Freedman's home address]"  The September 2010 letter stated: "What did I tell you bitch  [¶]  Your perjuring days are over you cock sucking mother fucker  [¶]  Remember that the next time you think about committing perjury you little fucking cock sucker."

fabricated" 1998 decision which tried to deny defendant his "rights and livelihood to become a teacher."

Defendant failed to appear at the November 15, 2010 hearing, and the court imposed another three-year restraining order, to expire on November 14, 2013.

*Anonymous Letters Sent in 2011, Contempt Conviction,*

*and Other Actions by Defendant*

After issuance of the 2010 restraining order, additional anonymous typed letters were sent to Freedman's home and office in January and February 2011. The January letter stated: "Your perjuring days are over you cock sucking little bitch, remember that because there is not a rock on the face of this earth you are going to be able to hide under[.]" The February letter stated: "Your perjuring days are over motherfucker. [¶] Remember that you cock sucking piece of shit [Freedman's home address]."

After receiving the January and February 2011 letters, on July 12, 2011, Freedman filed an order to show cause (OSC) to hold defendant in contempt for violating the 2010 restraining order. Defendant appeared at an ex parte hearing on July 20, and the matter was set for a full hearing. About one week after the ex parte hearing, on July 28, 2011, another anonymous typed letter was sent to Freedman's home. The letter stated: "[Freedman's home address] you perjuring motherfucker [¶] your perjuring days are over cocksucker."

While the hearing on the contempt petition was pending, in October 2011 defendant filed a federal lawsuit against Freedman in which he complained about the 1998 administrative proceeding, stating that Freedman framed him, improperly failed to

7

disclose that he was a pro tem ALJ, made false and fabricated statements in his decision, and defrauded defendant out of "[l]iterally millions of dollars."

The contempt petition was adjudicated in November 2011, with defendant in attendance. The court found defendant in contempt, and ordered him to serve 25 days in custody, with a report date of January 3, 2012. On December 19, 2011, defendant's federal lawsuit against Freedman was dismissed with prejudice.

On December 27, 2011 (one week before defendant's date to report for custody), another anonymous typed letter was sent to Freedman's home, stating: "Your perjuring days are over you cocksucking motherfucker we'll see how much perjury you do with your brains splattered all over the wall the end will come at a time and place of my choosing you little fucking bitch[.]" Freedman contacted the police, and the police recommended that he and his wife leave town.

On January 13, 2012, the district attorney's office filed the stalking and other charges at issue in the case before us. Freedman received no more threatening letters after the December 2011 letter. Freedman testified that he was certain all the anonymous letters were sent by defendant, explaining that defendant was the only person who had made accusations that Freedman had committed perjury, ruined his life, and conspired to frame him.

*Defense*

Defendant did not dispute that he sent the letters to Freedman in 2000 and 2006 which referenced the 1998 administrative hearing, but claimed he did not send the anonymous letters that were sent starting in 2009.

8

Testifying on his own behalf, defendant stated that while his substitute teaching permit application was pending he had obtained teaching jobs and was doing well; the Commission's denial of his permit caused him to lose these jobs; and even after the superior court overturned the Commission's denial he was unable to get rehired in the teaching field because too much time had passed, he would have had to return to school to retake credentialing classes, and he lacked the funds to do this. Defendant maintained that because of the Commission's denial of his teaching permit, his career and future "had basically been destroyed." After losing his teaching career, he obtained a law degree from a school in another state so he could learn to defend himself; the California State Bar initially granted him the required background clearance and he took the California bar examination several times; but in 2005 or 2006 when he did not pass the California bar examination and had to renew his clearance application, the clearance was denied.

Concerning his communications to Freedman, defendant explained that after the superior court judge overturned the Commission's denial of his teaching permit, he sent the 2000 letter because he wanted Freedman to know "what an idiot he was." He sent the 2006 letter because during this time period he re-read Freedman's administrative decision to get information for his bankruptcy case that he was filing, and he noticed how "bad" the administrative decision was now that he had a legal education. He acknowledged he was "very angry" and writing the letter made him feel less angry, but denied that he intended the letter to be a threat.

Defendant stated that during the time period of the anonymous letters, he was occupied with filing numerous lawsuits in which he represented himself about a variety

9

of matters, and he filed these lawsuits to stand up for himself and others who could not defend their rights. He testified that he viewed the various judges who ruled against him as "lying," committing "perjury," and "railroad[ing] the poor and innocent," and he used derogatory language in pleadings and documents he filed concerning these judges because he was "blowing off steam" and the judges oppressed and "steamroll[ed] little people all the time" and he wanted them to know how he felt.[5] To support that he did not send the anonymous letters received by Freedman, he noted that he identified himself in these materials concerning the various judges. He stated that when he was upset with Freedman he sued him, and he had no reason to send Freedman anonymous letters and he had no idea who sent them.

*Jury Verdict and Sentence*

Defendant was charged with simple stalking between September 30, 2009 and December 29, 2011 (count 1, Pen. Code, § 646.9, subd. (a))[6]; stalking in violation of a court order between October 29, 2010 and December 29, 2011 (count 2, § 646.9, subd. (a)); making a criminal threat between December 27 and 29, 2011 (§ 422); and

---

[5]     In these various pleadings and documents, defendant stated such things as " 'slimeball, piece of shit, ass clown judges' "; " 'you cocksuckers are now on notice' "; " 'the days of dirty judges violating the Constitution with impunity are over' "; " 'civil unrest is going to start at the doorsteps of dirty slimeball judges who lie, commit perjury, and conspire with others to violate constitutional protections under color of authority' "; "I don't know how many dicks this pond scum, ass clown [judge] sucked to get appointed"; and "fuck you, [judge]."

[6]     Subsequent unspecified statutory references are to the Penal Code.

10

misdemeanor disobeying a court order between December 27 and 29, 2011 (§ 166, subd. (a)(4)). The jury found defendant guilty as charged.

At sentencing, the court selected a three-year term for count 2 stalking in violation of a court order and a concurrent term for count 1 stalking, and stayed the terms for counts 3 and 4. The court suspended execution of the sentence and granted defendant probation conditioned on a one-year jail sentence.

## DISCUSSION

### I. *Claim of Ineffective Assistance Based on Defense Counsel's Failure To Move To Exclude Defendant's Contempt Conviction*

Defendant argues his counsel provided ineffective representation because she did not move to exclude the evidence that he was convicted of contempt for sending letters to Freedman in violation of the November 2010 restraining order. He asserts the contempt conviction was excludable on the basis that it was secured in violation of his *Brady*[7] disclosure rights. In support, he asserts that prior to the contempt hearing the prosecution had conducted forensic testing on the January and February 2011 letters used to establish the contempt violation; the test results showed two fingerprints on the envelopes that did not belong to defendant and the absence of usable DNA matter; and the prosecutor failed to disclose this exculpatory information to defendant in the contempt proceedings.[8]

---

7      *Brady v. Maryland* (1963) 373 U.S. 83.

8      The testing results were admitted by stipulation of the parties in the current stalking trial. The fingerprint testing showed one fingerprint on the envelope sent to Freedman's home in January 2011 and one fingerprint on the envelope sent to Freedman's

To show ineffective representation, the defendant must establish that counsel's performance fell below an objective standard of reasonableness, and that there is a reasonable probability that absent counsel's deficiency the result would have been more favorable to the defendant. (*People v. Frye* (1998) 18 Cal.4th 894, 979.) To prevail on a claim of ineffective representation based on counsel's failure to file a motion, the defendant must show that there is a reasonable probability the motion would have been successful. (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223 & fn. 2; see *Frye, supra*, at pp. 985, 989.)

Defendant has not shown there is a reasonable probability the trial court would have excluded the contempt conviction if his counsel had requested this relief based on an alleged *Brady* violation during the contempt proceedings. A *Brady* violation occurs when the prosecution fails to disclose evidence that is favorable to the accused and material on the issue of guilt or innocence. (*People v. Lucas* (2014) 60 Cal.4th 153, 273-274.) In this context, evidence is material if its nondisclosure resulted in prejudice; i.e., if there is a reasonable probability that had the evidence been disclosed, the result of the proceeding would have been different. (*Id.* at p. 274; *People v. Alvarez* (2014) 229 Cal.App.4th 761, 771.)

The record shows that defendant's claim there was a *Brady* violation during the contempt proceedings was presented in support of his motion to dismiss the stalking case based on a variety of claims of prosecutorial error or misconduct. After a lengthy

office in February 2011. Other than excluding defendant, no other identification was made for the fingerprints. As to DNA, the testing showed an insufficient amount of DNA to test on the January envelopes, and no DNA on the February envelopes.

12

discussion with the parties, the trial court denied the motion to dismiss. When making its ruling, the court explicitly stated that it had "considered the *Brady* issue as part of the prosecutorial misconduct" and it "found no evidence of any violation there."

Based on this ruling, there is no basis to find the court would have reached a different conclusion concerning the existence of a *Brady* violation had defense counsel made a motion to exclude the contempt conviction instead of a motion to dismiss. Likewise, the record does not show the court was required to find a *Brady* violation. Assuming the forensic testing results were available to the prosecution at the time of the contempt proceeding and there was a prosecutorial duty of disclosure at this proceeding, defendant has not established the materiality prong of a *Brady* violation; i.e., that there is a reasonable probability that disclosure of the testing results would have resulted in defendant not being found in contempt.[9] The test results were exculpatory in the sense that they revealed that there was no affirmative forensic evidence tying defendant to the letters. However, the presence of someone else's fingerprints on the envelopes did not *exclude* defendant as the author because numerous people likely touched the envelopes

---

[9]     The Attorney General's office, not the district attorney's office, was the prosecutorial agency at the contempt proceeding. During the pretrial hearings at the stalking trial, the deputy district attorney maintained he had no duty of disclosure with respect to the contempt proceeding, whereas defense counsel argued the deputy district attorney knew about the test results at the time of the contempt proceedings and the deputy district attorney and the deputy attorney general were in communication. The stipulation at the stalking trial setting forth the forensic testing results does not indicate when the testing occurred; however, defense counsel told the court that it was clear from the discovery in the stalking case that at the time of the contempt hearing some of the letters had undergone the DNA and fingerprint testing.

13

during the mailing process. Also, the absence of DNA evidence shed no light one way or the other as to the author of the letters.

Because the forensic testing results provided minimal information concerning the question of authorship, there is no reasonable probability that disclosure of the results would have caused the court not to find defendant in contempt at the contempt hearing; accordingly the *Brady* claim fails to satisfy the materiality requirement. And, absent a showing that a *Brady* violation actually occurred at the contempt proceeding, there is no reasonable probability the trial court at the current criminal trial would have excluded the contempt conviction on *Brady* grounds had defense counsel brought such a motion.

Also, the record supports that the contempt conviction was highly relevant because it supported the prosecution's theory that defendant had a motive to send the overtly-threatening anonymous December 2011 letter, which was mailed a few days before defendant was ordered to report for custody for the contempt. We note further that to ensure the jury would not improperly rely on the contempt finding to establish defendant's identity as the author of the anonymous letters for purposes of the stalking charges, the jury was given special instructions stating the evidence of other legal proceedings was relevant solely to the issue of motive or other limited purposes specified by the court; the prior contempt finding involved different law and evidence and should not be considered as evidence that defendant had committed the current charged offenses; and the jury should make its own independent determination of the facts presented in the current trial.

14

Given the showing that there was no *Brady* violation, as well as the high relevancy of the contempt conviction on the issue of motive and the provision of a limiting instruction to prevent improper use of the conviction, there is no reasonable likelihood a defense motion to exclude the conviction would have been successful. Accordingly, defendant's claim of ineffective assistance is unavailing.

II. *Claims of Prosecutorial Misconduct and Erroneous Court Rulings*

Defendant argues he was deprived of a fair trial because during cross-examination of defendant and closing arguments, the prosecutor improperly attempted to disparage his character to bias the jury against him. He contends the prosecutor engaged in excessive cross-examination on collateral, irrelevant, and prejudicial matters and sought to depict him as a child molester and "parasite" on society. Also, he contends the trial court abused its discretion and failed to ensure a fair trial because it overruled many of his counsel's objections and allowed the prosecutor to continue to present collateral and prejudicial information to the jury.

We have reviewed the record, including defendant's testimony on direct and cross-examination and the prosecutor's closing arguments, and find no prosecutorial misconduct or abuse of discretion by the trial court. When questioned on direct examination, defense counsel elicited a substantial amount of testimony from defendant about a wide variety of matters to support the theory that defendant had no reason to send anonymous letters because when he was angry at a judge he openly filed derogatory pleadings without trying to conceal his identity. This testimony included defendant's views about the various legal matters he was involved in, including the administrative

15

proceeding before Freedman, his bankruptcy, lawsuits he filed concerning his student loans, a lawsuit he filed against the state bar and its employees concerning the denial of his background clearance, and complaints and letters he sent to California's Commission on Judicial Performance regarding the judge who convicted him of contempt.

For example, defendant testified about his 1982 conviction for contributing to the delinquency of a minor that gave rise to the Commission's denial of his teaching permit application (see fn. 1, *ante*). Defendant stated that he met some girls at an "over 21" bar and then went to the car with the girls to drink beer; when he entered his plea he did not have a lawyer and was never offered one; the judge told him if he went to trial and lost he would receive three years in prison; the judge offered to give him a fine and that would " 'be the end of it' "; and at the time of his plea he was under the influence of pain killers due to a motorcycle injury. Further, he said he did not disclose this conviction on his teaching credential application because the application asked if he had ever been convicted of a crime in an Education Code section, and there was no way for him to discover what crimes were covered by the Education Code section without hiring a lawyer which he did not have the money to do.

Defendant testified that Freedman's administrative decision contained "millions of things that were completely unfounded" and the decision had "no legal standing at all"; he was very upset that Freedman referenced a dispute about cocaine use in his decision because there was no evidence of this at the hearing; Freedman's decision referenced information in a police report that Freedman had excluded from evidence; and defendant submitted documentation showing that his 1982 conviction had been expunged. Also,

16

defendant first learned that Freedman was a pro tem judge when he was served with the restraining order in 2010; he sued Freedman for fraud based on this nondisclosure; and he lost his case against Freedman because of the doctrine of judicial immunity which allows judges to "cheat and defraud people . . . with impunity."

Further, defendant testified that he filed for bankruptcy because he was unable to obtain employment and pay his student loans after the Commission denied him his teaching permit, and he pursued lawsuits about student loans because student loans could not be discharged in bankruptcy and this was a "gigantic scam." Regarding a complaint he filed in federal court, defendant opined the federal judge should not have dismissed the complaint with prejudice but should have done so without prejudice, and this judge committed "perjury in her order" and set forth a reason that was "completely bogus." Overall, defendant maintained that his lawsuits concerned legitimate claims and he did not pursue them to be a nuisance or to be threatening; rather, he was a voice for the "weak, the little guy" because he had a legal education and could at least try to fight back.

Following defendant's testimony on direct examination, the prosecutor engaged in a lengthy cross-examination of defendant, which—in addition to questions directly related to the letters sent to Freedman—included questions about such matters as whether defendant knew the age of the girls with whom he was drinking beer in 1982; whether the transcript of the 1998 administrative hearing supported his complaints about Freedman's decision; his claimed inability to obtain employment and to pay his student loans; the contents of the various lawsuits that he pursued and accusations he made against judges; and his understanding of legal concepts related to his claims of improper judicial conduct

17

and decisionmaking. During the course of the questioning, defense counsel frequently objected that the questions were irrelevant or argumentative, and in several instances complained the prosecutor was engaging in improper impeachment on collateral matters and had "gone far beyond what's appropriate." The court overruled many of the objections, and during discussions outside the presence of the jury, the court stated that the cross-examination questions were related to defendant's direct examination testimony. At various points the court did, however, state the prosecutor should "move on" and finish his cross-examination, and at one point curtailed the prosecutor's questioning under Evidence Code section 352.

To violate a defendant's constitutional rights, the prosecutor must engage in a pattern of conduct so egregious that it renders the trial fundamentally unfair, or the prosecutor's conduct must involve deceptive or reprehensible methods to attempt to persuade the jury. (*People v. Hamilton* (2009) 45 Cal.4th 863, 950.) A prosecutor is given wide latitude to vigorously argue the case as long as the argument is "a fair comment on the evidence, which can include reasonable inferences or deductions to be drawn therefrom." (*People v. Harrison* (2005) 35 Cal.4th 208, 244.) Also, when a defendant chooses to take the stand, the defendant is subject to cross-examination in the same manner as any other witness, and the prosecutor has wide latitude to ask questions and may do so in a vigorous manner. (*People v. Mayfield* (1997) 14 Cal.4th 668, 755; *People v. Arias* (1996) 13 Cal.4th 92, 175; *People v. Cooper* (1991) 53 Cal.3d 771, 822.) Although the prosecutor should not question a defendant about matters that are collateral to the issues (*People v. Ortega* (1969) 2 Cal.App.3d 884, 902), a defendant may properly

18

be cross-examined upon any matter within the scope of direct examination (*People v. Price* (1991) 1 Cal.4th 324, 474; *People v. Saddler* (1979) 24 Cal.3d 671, 679).  On appeal, we review the trial court's rulings with respect to cross-examination for abuse of discretion.  (*People v. Mayfield, supra*, 14 Cal.4th at pp. 755-756.)

Contrary to defendant's contention, the record does not show that the prosecutor improperly impugned defendant's character or questioned him about collateral, irrelevant matters.[10]  Rather, the record supports that the cross-examination and closing arguments were within the scope of permissible, vigorous cross-examination and argument and related to matters elicited on direct examination.  For example, defendant complains the prosecutor was permitted to insinuate that his 1982 offense involved an attempt to get the girls drunk so he could commit a sexual molestation crime.[11]  The trial court could

---

[10]  To the extent defense counsel failed to object to prosecutorial misconduct and request jury admonishment, the claims are forfeited on appeal unless these measures would have been futile or ineffective to cure the harm.  (*People v. Harrison, supra*, 35 Cal.4th at pp. 243-244.)  In any event, because we find no prosecutorial misconduct, we need not address the Attorney General's claim of forfeiture nor defendant's alternative claim of ineffective assistance of counsel.

[11]  Defendant complains because during cross-examination questioning, the prosecutor included the unestablished detail that the incident occurred "after dark"; stated that defendant was trying to get the girls drunk; and asked defendant "Why were you giving a 14-year-old girl alcohol?  Was it for the conversation?"  Similarly, in closing arguments the prosecutor argued that defendant was "feeding" the girls alcohol "after dark" and defendant knew the Commission would be interested to know that he "tried to get a 14-year-old girl in a car drunk."  Further, when Freedman testified on direct examination he referred to the incident as involving a "little girl," and the court responded to defense counsel's objection by clarifying for the jury that the girls were 14 and 15 years old.  On rebuttal, the prosecution argued to the jury, "The fact of the matter is, a 14-year-old girl is a little girl, and we all know it, especially when we're talking about a man giving her alcohol.  [¶]  So Mr. Freedman giving his opinion that she was a little girl, yet

19

reasonably determine that the prosecutor's questioning and arguments on this point were permissible responses to defendant's testimony that he met the girls at an "over 21" bar, thus suggesting the girls appeared not to be minors and that the encounter was benign.

Also, defendant argues the prosecutor's questioning and closing arguments insinuated to the jury that defendant was "nefariously withholding evidence" because he did not submit into evidence the transcript of the 1998 administrative hearing. The trial court could reasonably view the questioning and arguments concerning the administrative hearing transcript as permissible responses to defendant's testimony that the record of the administrative hearing showed the falsity and impropriety of matters set forth in Freedman's administrative decision. (See *People v. Jasso* (2012) 211 Cal.App.4th 1354, 1370-1371 [although defendant has no duty to present evidence, prosecutor may properly comment on a defendant's failure to present logical evidence to support defense theory]; *People v. Wilson* (2005) 36 Cal.4th 309, 338.)

We note further that the record does not support defendant's claim that the prosecutor committed misconduct by continuing to refer to defendant's failure to produce the transcript even though the court sustained objections to the questioning. Although the court sustained defense objections to certain particular questions and sought to limit excessive questioning, the court ruled the prosecutor could generally pursue this avenue of questioning. Also, to the extent the prosecutor continued with a line of questioning

---

[defense counsel] wants you to to . . . find that that affects his credibility negatively. Really? Does she really? [¶] Which one of you thinks a 14-year-old is not a little girl for purposes of alcohol in a car with a guy? [¶] . . . [¶] . . . A 14-year-old in a bar with her 15-year-old friend. I'm sure they looked—they must have looked at least 17. Please. They weren't out in that car for the conversation."

notwithstanding the court's sustaining of a defense objection, this conduct was isolated and did not constitute egregious behavior creating an unfair trial or a reprehensible method to attempt to persuade the jury. (*People v. Hamilton, supra*, 45 Cal.4th at p. 950.)

Defendant further posits the prosecutor improperly cross-examined him, introduced into evidence, and made closing arguments about numerous collateral matters, including concerning the pleadings and other documents filed by defendant in other cases; the definitions of various legal concepts and defendant's misunderstanding of these concepts; and defendant's claimed inability to obtain jobs and pay his student loans.[12] The trial court could reasonably find that these matters related to defendant's testimony on direct examination concerning the reasons he filed lawsuits and believed the judges' decisions were legally incorrect, and the financial and employment difficulties he claimed to have suffered because of the Commission's denial of his permit.

Although the prosecutor's examination of defendant was lengthy, it stayed within the bounds of permissible cross-examination on matters raised by defendant in direct examination. Likewise, the evidence introduced by the prosecutor, the prosecutor's closing argument, and the instructions were a reasonable response to the defense case.

---

[12] To assist the jury concerning the various legal concepts referenced during defendant's testimony, the court provided the jury with the definition of moral turpitude, and instructed the jury that pro tem administrative law judges are not required to disclose their pro tem status; perjury does not apply to judicial decisions; and expungement does not dispense with the duty to disclose a conviction on governmental licensing applications.

21

Defendant's claim that he was deprived a fair trial due to prosecutorial misconduct or court error is unavailing.

### III. *Dismissal of Count 1 Stalking Offense*

Defendant argues the count 1 simple stalking conviction must be dismissed because it is a lesser included offense of the count 2 conviction for stalking in violation of a court order. The Attorney General does not dispute that count 1 is a lesser included offense of count 2, but contends two convictions are proper because the offenses concern different acts committed during different time periods. Under the circumstances of this case, we conclude only one stalking conviction is warranted.

A defendant may properly sustain multiple convictions for different offenses or different statements of the same offense based on a single criminal act or an indivisible course of conduct, unless one offense is necessarily included in the other. (*People v. Gonzalez* (2014) 60 Cal.4th 533, 536-537; § 954.) For purposes of the multiple conviction bar, an offense is necessarily included in another offense if all the elements of the lesser offense are included in the elements of the greater offense, so that the greater cannot be committed without also committing the lesser. (*People v. Montoya* (2004) 33 Cal.4th 1031, 1034.) Because by definition a greater offense cannot be committed without also committing a lesser included offense, the multiple conviction bar prevents the defendant from in effect being convicted *twice* of the lesser offense. (*People v. Medina* (2007) 41 Cal.4th 685, 702.)

However, in some circumstances a defendant may sustain multiple convictions based on the *same* statutory crime (or, logically, a lesser offense included within that

22

crime) when the circumstances show a *divisible* course of conduct establishing multiple criminal violations. For example, multiple convictions of the same offense have been found proper for *distinct* acts each of which gave rise to a *completed* crime, even though the offenses were otherwise committed during a single incident or course of conduct. (See, e.g., *People v. Johnson* (2007) 150 Cal.App.4th 1467, 1473-1477 [defendant could properly be convicted of multiple counts of corporal injury to a cohabitant occurring during single incident because each infliction of injury completed the statutory crime]; accord *People v. Healy* (1993) 14 Cal.App.4th 1137, 1138-1140 [multiple convictions of corporal injury to cohabitant occurring over one-year time period].) In contrast, some offenses are by their nature viewed as contemplating a *continuous course of conduct* that should give rise to only one conviction of the same offense for the same course of conduct. (See, e.g., *People v. Lewis* (1978) 77 Cal.App.3d 455, 459-461 [only one conviction of pimping based on ongoing conduct with the same prostitute during a five-year period].) On the other hand, some types of crimes that are recognized as continuing offenses have nevertheless been deemed to warrant multiple convictions when there are distinct criminal acts that effectively create *independent courses of conduct*. (See, e.g., *People v. Meeks* (2004) 123 Cal.App.4th 695, 702-703 [multiple convictions proper based on distinct acts of failing to register upon change of address and failing to register on birthday; "a failure to register when one moves to a different residence is a continuing offense; a failure to register on the event of the defendant's birthday is a separate continuing offense"].)

23

The offense of stalking is defined in section 646.9, subdivisions (a) through (d), with each subdivision providing for different punishments depending on the attendant circumstances.  The statute defines, and prescribes particular punishments, for simple stalking (§ 646.9, subd. (a)); stalking in violation of a court order (§ 646.9, subd. (b)); and stalking after having been convicted of specified felonies (§ 646.9, subd. (c)).  The elements of stalking are repeatedly following or harassing another person, and making a credible threat with the intent to place that person in fear.  (§ 646.9, subd. (a); *People v. Muhammad* (2007) 157 Cal.App.4th 484, 493, fn. 8.)  Simple stalking is a lesser included offense of stalking in violation of a court order because the latter offense necessarily constitutes a commission of the former offense.  (See *Muhammad, supra*, at p. 490, fn. 6.)  Further, the stalking statute has been construed as defining a single offense, albeit with different associated penalties under each subdivision.  (*Id.* at pp. 490-492.)  Also, stalking is viewed as a continuing offense because it requires repeated following or a course of harassing conduct.  (§ 646.9, subds. (a), (e), (f) [stalking crime committed by "person who willfully, maliciously, and repeatedly follows or willfully and maliciously harasses another person"; " 'harasses' means engages in a knowing and willful course of conduct"; " 'course of conduct' means two or more acts occurring over a period of time, however short, evidencing a continuity of purpose"]; *People v. Chilelli* (2014) 225 Cal.App.4th 581, 586.)

Given that the stalking statute defines a single, continuing offense that requires repetitive behavior, and that simple stalking is necessarily included within aggravated stalking, typically a defendant cannot sustain both simple stalking and aggravated

24

stalking convictions absent some type of circumstance that separates the defendant's behavior into two severable courses of conduct.  For example, in *Muhammad*, the court concluded the defendant could incur only one stalking conviction in a case involving allegations of simple stalking and aggravated stalking (i.e., stalking in violation of a court order and stalking with specified felony convictions).  (*People v. Muhammad, supra*, 157 Cal.App.4th at p. 494.)  The restraining order in *Muhammad* was issued in August 2003, and the information charged the defendant with one simple stalking count and three aggravated stalking counts between December 2003 and December 2004.  (*Id*. at pp. 487, 489, fn. 3.)  Thus, all the stalking counts in *Muhammad* were based on conduct that occurred during the same time period after issuance of the restraining order.

Here, the TRO was served on defendant on October 27, 2010, and the information charged defendant with (1) count 1 simple stalking between September 30, 2009 and December 29, 2011, and (2) count 2 stalking in violation of a court order between October 29, 2010 (when the first letter was sent after service of the TRO) and December 29, 2011.  As charged in this case, both counts 1 and 2 involved *the same* post-TRO conduct occurring between October 2010 and December 2011.  Thus, defendant was *not* charged in a manner that divided counts 1 and 2 into severable courses of conduct (i.e., pre-TRO acts between September 2009 and October 26, 2010, and post-TRO acts after

25

October 27, 2010), and the jury was never called upon to decide whether the elements of simple stalking were satisfied by the pre-TRO acts alone.[13]

Based on the overlapping time periods in counts 1 and 2, this case equates with the circumstances in *Muhammad*, involving allegations of simple stalking and stalking in violation of a court order based on a single, indivisible course of conduct. Accordingly, only a single stalking conviction is warranted. Because the court selected count 2 as the principal offense and imposed a concurrent sentence on count 1, we modify the judgment to dismiss the count 1 simple stalking conviction.

---

[13] Also, the jury was given an instruction on unanimity stating that the prosecution had presented evidence of eight acts between September 30, 2009 and December 29, 2011 to prove count 1, and evidence of five acts between October 29, 2010 to December 29, 2011 to prove count 2; for a guilty verdict the jury had to all agree that defendant committed at least two of these acts for each count; but they did not have to all agree on which two acts he committed. The eight acts referred to for count 1 consisted of the three pre-TRO acts of correspondence, plus the five post-TRO acts of correspondence. Thus, consistent with the charges in the information, this instruction directed the jury to consider the same five post-TRO acts occurring during the same time period for both counts 1 and 2, rather than to view each count as involving entirely distinct courses of conduct.

DISPOSITION

The judgment is modified to vacate the count 1 simple stalking conviction.  In all other respects, the judgment is affirmed.


HALLER, J.

WE CONCUR:


McCONNELL, P. J.


McINTYRE, J.